ACCEPTED
12-15-00014-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
6/3/2015 3:52:12 PM
CATHY LUSK
CLERK

**ORAL ARGUMENT REQUESTED**

No. 12-15-00014-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
6/3/2015 3:52:12 PM
CATHY S. LUSK
Clerk

_____

# COURT OF APPEALS

for the

## TWELFTH DISTRICT OF TEXAS

Tyler, Texas

_____

**East Texas Medical Center d/b/a East Texas Medical Center
Emergency Medical Services**
Appellant,

v.

**Jody Delaune, Individually and as Personal Representative of the Estate of
Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D, Minors**
Appellee.

_____

Appeal from Cause No. 13-0984-A
7TH District Court, Smith County, Texas
Honorable Kerry L. Russell, Presiding Judge

_____

## APPELLANT'S BRIEF ON THE MERITS
_____

Russell G. Thornton
THIEBAUD REMINGTON THORNTON BAILEY LLP
Two Energy Square
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206
(214) 954-2200 – Telephone
(214) 754-0999 – Telecopier

ATTORNEYS FOR DEFENDANT – APPELLANT
East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services

June 3, 2015

## LIST OF PARTIES AND COUNSEL

In order that members of the Court may determine disqualification or recusal, Appellant certifies that the following is a complete list of the names and addresses of parties to this appeal and their counsel:

**APPELLEE:**

Jody Delaune, Individually and as Personal Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D., Minors

**COUNSEL FOR APPELLEE:**

Mr. Ryan Krebs, M.D., J.D.
THE LAW OFFICE OF RYAN KREBS
805 W. 10th Street, Suite 300
Austin, Texas  78701

**APPELLANT:**

East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services

**COUNSEL FOR APPELLANT:**

Russell G. Thornton (Appeal)
Stan Thiebaud (Trial)
R. Gregg Byrd (Trial)
THIEBAUD REMINGTON THORNTON
  BAILEY LLP
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206

# TABLE OF CONTENTS

LIST OF PARTIES AND COUNSEL ......................................................................... i

INDEX OF AUTHORITIES ................................................................................... iv

STATEMENT OF THE CASE ................................................................................ 2

REQUEST FOR ORAL ARGUMENT ..................................................................... 4

ISSUES PRESENTED ........................................................................................... 5

    **I.    Judgment in Favor of Appellee Should be Reversed Because There is Legally Insufficient Evidence of Proximate Cause Against ETMC**

    **II.   Judgment in Favor of Appellee Should be Reversed Because There is Legally Insufficient Evidence of the Applicable Standard of Care and Breach by ETMC**

STATEMENT OF FACTS ...................................................................................... 6

SUMMARY OF ARGUMENT ............................................................................... 16

ARGUMENT ....................................................................................................... 18

    I.    Judgment in Favor of Appellee Should be Reversed Because There is Legally Insufficient Evidence of Proximate Cause Against ETMC ...... 20

    II.   Judgment in Favor of Appellee Should be Reversed Because There is Legally Insufficient Evidence of the Applicable Standard of Care and Breach by ETMC ............................................................................... 26

CONCLUSION .................................................................................................... 45

PRAYER ............................................................................................................ 48

CERTIFICATE OF COMPLIANCE ...................................................................... 49

CERTIFICATE OF SERVICE ............................................................................... 50

APPENDIX ...................................................................................INDEX TAB

    A.      December 23, 2014 Final Judgment

    B.      November 24, 2014 Charge of Court completed by jury

    C.      July 28, 2014 Order Granting Defendants' Moore and Spurgers' Motions for Summary Judgment

    D.      *Wansey v. Hole,* 379 S.W.3d 246 (Tex. 2012)

    E.      *Wal-Mart Stores, Inc. v. Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 (Tex. App.—San Antonio)(Jun. 11, 2003)(pet. denied)(mem. op.)

    F.      *Gonzales v. Willis,* 995 S.W.2d 729 (Tex. App.—San Antonio 1999, no pet.), *overruled in part on o.g., Hoffman-LaRoche v. Zeltwanger,* 155 S.W.3d 438 (Tex. 2004)

    G.      *The Methodist Hospital v. German,* 369 S.W.3d 333 (Tex. App.—Houston [1st Dist.] 2011, pet denied)

# INDEX OF AUTHORITIES

**UNITED STATES DISTRICT COURT CASES:**

*Allen v. Wal-Mart Stores Texas, LLC,*
2015 U.S. Dist. LEXIS 56425 (S.D. Tex.)(Apr. 29, 2015) .................................................. 21

*Goodarzi v. Hartzog,*
2013 U.S. Dist. LEXIS 85727 (S.D. Tex.)(Jun. 14, 2013) ................................................ 20

*Hughes v. Yodle, Inc.,*
2015 U.S. Dist. LEXIS 63011 (W.D. Tex.)(May 14, 2015) .............................................. 21

*Udoewa v. Plus 4 Credit Union*,
2009 U.S. Dist. LEXIS 54964 (S.D. Tex.)(June 29, 2009) ................................................ 20

**TEXAS SUPREME COURT CASES:**

*AutoZone, Inc. v. Reyes¸*
272 S.W.3d 588 (Tex. 2008) .......................................................................................... 19

*Burrow v. Acre,*
997 S.W.2d 229 (Tex. 1999) .......................................................................................... 29

*City of Keller v. Wilson,*
168 S.W.3d 802 (Tex. 2005) ............................................................. 18, 19, 31, 34, 35, 44

*City of San Antonio v. Pollock,*
284 S.W.3d 809 (Tex. 2009) .................................................................................. 29, 30, 33

*Coastal Transportation Co. v. Crown Central Petroleum Corp.,*
136 S.W.3d 227 (Tex. 2004) .......................................................................................... 29

*Earle v. Ratliff,*
998 S.W.2d 882 (Tex. 1999) .......................................................... 28, 29, 33, 34, 37, 38

*Exxon Corp. v. Emerald Oil & Gas Co.,*
348 S.W.3d 194 (Tex. 2011) .......................................................................................... 18

*Jackson v. Axelrad,*
221 S.W.3d 650 (Tex. 2007) .......................................................................................... 26

*Jelinek v. Casas,*
328 S.W.3d 526 (Tex. 2010) ..........................................................28, 29, 33, 34, 37, 38

*Marathon Oil Corp. v. Pitzner,*
106 S.W.3d 724 (Tex. 2003) ........................................................................ 19, 30, 36

*Tanner v. Nationwide Mutual Fire Ins. Co.,*
289 S.W.3d 828 (Tex. 2009) ...................................................................................... 18

*Wansey v. Hole,*
379 S.W.3d 246 (Tex. 2012) ......................................................................... 21, 24, 25

**TEXAS COURTS OF APPEALS CASES:**

*Allsup's Convenience Stores, Inc. v. Warren,*
934 S.W.2d 433 (Tex. App.—Amarillo, 1996, writ denied) ................... 28, 37, 38, 41, 42

*Chopra v. Hawryluk,*
892 S.W.2d 229 (Tex. App.—El Paso, 1995, writ denied) ............................ 27, 28, 37, 38

*Clark v. PFPP Limited Partnership,*
455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no pet.) ................................................ 21

*Cobb v. Dallas Fort Worth Medical Center,*
48 S.W.3d 820 (Tex. App.—Waco 2001, no pet.) ........................................................ 26

*Crown Pine Timber 1, L.P. v. Durrett,*
2012 Tex. App. LEXIS 3658 (Tex. App.—Tyler)(May 9, 2012)(no pet.)(mem. op.)  18, 44

*Dangerfield v. Ormsby,*
264 S.W.3d 904 (Tex. App.—Fort Worth 2008, no pet.) ................................... 28, 36, 38

*Denton Regional Medical Center v. Lacroix,*
947 S.W.2d 941 (Tex. App.—Fort Worth 1997, pet. dism'd by agmt.) ................... 23, 24

*Gonzales v. Sid Peterson Memorial Hospital,*
2000 Tex. App. LEXIS 3137 (Tex. App.—San Antonio)(May 17, 2000)(pet. denied)(mem. op.) ........................................................................................................ 27

*Gonzales v. Willis,*
995 S.W.2d 729 (Tex. App.—San Antonio 1999, no pet.), *overruled in part on o.g., Hoffman-LaRoche v. Zeltwanger,* 155 S.W.3d 438 (Tex. 2004) ............................... 20, 25

*Host Marriott Corp. v. Meadows,*
2001 Tex. App. LEXIS 4409 (Tex. App.—Dallas)(Jun. 20, 2001)(pet. denied)(not designated for publication) ................................................................................ 20, 25

*Jones v. Miller*,
966 S.W.2d 851 (Tex. App—Houston [1st Dist.] 1998, no pet.) ...................................... 26

*Kingwood Pines Hospital, LLC v. Gomez,*
362 S.W.3d 740 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ........................... 26, 27

*LaBella v. Charlie Thomas, Inc.,*
942 S.W.2d 127 (Tex. App.—Amarillo 1997, writ denied) ............................................. 20

*Latimer v. Memorial Hermann Hospital System,*
2011 Tex. App. LEXIS 423 (Tex. App.—Houston [14th Dist.])(Jan. 20, 2011)(no pet.)(mem. op.) ..................................................................................... 24, 25, 26

*Lermon v. Minyard Food Stores, Inc.,*
2014 Tex. App. LEXIS 12498 (Tex. App.—Dallas)(Nov. 19, 2014)(pet. filed)(mem. op.)
 ............................................................................................................................ 21, 27

*Mackey v. U.P. Enterprises, Inc.,*
935 S.W.2d 446 (Tex. App.—Tyler 1996, no pet.) ...................................................... 39, 40

*Morrell v. Finke,*
184 S.W.3d 257 (Tex. App.—Fort Worth 2005, pet. denied) .......................................... 26

*Nichols v. Nacogdoches Hospital District,*
96 S.W.3d 582 (Tex. App.—Tyler 2002, no pet.) ..................................................... 26, 27

*Ortegon v. Benavides,*
2008 Tex. App. LEXIS 1576 (Tex. App.—San Antonio)(Mar. 5, 2008)(pet. denied)(mem. op.). ....................................................................................................................... 26, 27

*Patino v. Complete Tire, Inc.,*
158 S.W.3d 655 (Tex. App.—Dallas 2005, pet. denied) ........................ 28, 37, 38, 43, 44

*Shaw v. BMW Healthcare, Inc.,*
100 S.W.3d 8 (Tex. App.—Tyler 2002, pet. denied) ................................... 27, 28, 37, 38

*The Methodist Hospital v. German,*
369 S.W.3d 333 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ....................... 21, 25

*Vaughn v. Drennon,*
372 S.W.3d 726 (Tex. App.—Tyler 2012, no pet.) ........................................................ 18

*Wal-Mart Stores, Inc. v. Aguilera-Sanchez,*
2003 Tex. App. LEXIS 4846 (Tex. App.—San Antonio)(Jun. 11, 2003)(pet. denied)(mem. op.) ....................................................................................................... 20, 21, 24, 25

**CASE LAW FROM OTHER JURISDICTIONS:**

*Haverly v. Kaytec, Inc.,*
738 A.2d 86 (Vt. 1999) ................................................................................................. 22

*Hogan v. Forsyth Country Club Co.,*
340 S.E.2d 116 (N.C. App. 1986) ................................................................................ 22

*Louis Marsch, Inc. v. Pekin Ins. Co.,*
491 N.E.2d 432 (Ill. App. 1985) .................................................................................. 22

*Mulhern v. City of Scottsdale,*
799 P.2d 15 (Ariz App. 1990) ...................................................................................... 22

*Rogala v. District of Columbia,*
161 F.3d 44 (D.C. Cir.1998) ......................................................................................... 22

*Schoff v. Combined Ins. Co. of America,*
604 N.W.2d 43 (Iowa 1999) ......................................................................................... 22

*Stevenson v. Precision Standard, Inc.,*
762 So.2d 820 (Ala. 1999) ........................................................................................... 22

*Texas Skaggs, Inc. v. Joannides,*
372 So.2d 985 (Fla. App. 1979) ................................................................................... 22

*Thrasher v. Ivan Leonard Chevrolet, Inc.,*
195 F.Supp.2d 1314 (S.D. Ala. 2002) .......................................................................... 22

*Tindall v. Enderle,*
320 N.E.2d 764 (Ind. App. 1974) ................................................................................ 22

No. 12-15-00014-CV

_____

# COURT OF APPEALS

for the

TWELFTH DISTRICT OF TEXAS

Tyler, Texas

_____

**East Texas Medical Center d/b/a East Texas Medical Center
Emergency Medical Services**

*Appellant,*

v.

**Jody Delaune, Individually and as Personal Representative of the Estate of
Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D., Minors,**
*Appellee.*

_____

Appeal from Cause No. 13-0984-A
7th Judicial District Court, Smith County, Texas
Honorable Kerry L. Russell, Presiding Judge

_____

TO THE TWELFTH COURT OF APPEALS:

Appellant East Texas Medical Center d/b/a East Texas Medical Center Emergency

Medical Services, Defendant in Cause No. 13-0984-A in the 7th Judicial District Court of

Smith County, Texas, Honorable Kerry L. Russell presiding, respectfully submits its

Brief on the Merits. Appellee is Jody Delaune, Individually and as Personal

Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of D.D.,

D.D. and DA.D., Plaintiff in the district court.

**1**

## STATEMENT OF THE CASE

**Nature of the case:**
Appellee asserts a health care liability claim against Appellant East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services ("ETMC")(*See,* CR 1-9; 1 CR 5-12)(Please note that the Clerk's Record submitted to the Tyler Court of Appeals is submitted [1] with consecutive bates numbers in the lower right hand corner of each document ranging from 1 – 1095, and [2] in five volumes. Hereinafter references to the 5 volumes of the Clerk's Record will [1] cite "CR" followed by the proper 1 – 1095 Bates number and [2] also cite the specific volume of the Clerk's record, followed by "CR," followed by the page number of that specific volume of the Clerk's Record. For example, "1 CR 1" refers to page 1 of Volume 1 of the Clerk's Record. References to the 22 volumes of the Reporter's Record will be made in the same manner, but with the designation "RR" rather than "CR"). This claim arises out of the death of Ms. Crystal Delaune ("Ms. Delaune") when she jumped out of an ETMC ambulance on August 19, 2012 while being transported to the hospital during an emotional crisis (CR 5; 1 CR 9; 3 RR 26, lines 22-24). Ms. Linda Moore and Ms. Lindsay Spurgers were the ETMC employees in the ambulance with Ms. Delaune at that time. The issue tried to the jury was ETMC's direct liability to Appellee for Ms. Delaune's death. Appellee's only claim against ETMC was that it failed to train Ms. Moore and Ms. Spurgers on the use of restraint in handling patients like Ms. Delaune (*See,* 2 RR 206, line 23 – 207, line 14; 3 RR 174, lines 10-11; 6 RR 173, lines 11-18; 179, lines 6-13; 182, lines 3-7)

**Course of proceedings:**
Appellee filed his Original Petition on April 15, 2013 (CR 1; 1 CR 5). Appellee asserted negligence claims against ETMC, Ms. Moore and Ms. Spurgers (CR 6; 1 CR 10). During the pretrial proceedings, Defendants Moore and Spurgers moved for summary judgment on the claims against them on both a "traditional" and a "no evidence" basis, wherein they asserted that they were not negligent, as alleged (CR 36-298; 1 CR 40-

2

250; 2 CR 5-23). On July 29, 2014, the trial court entered an order granting Ms. Moore and Ms. Spurgers' motion for summary judgment and dismissing Appellee's claims against them with prejudice (CR 365-66; 2 CR 119-120). On November 18, 2014, the trial court called the case to trial. The parties announced ready for trial and a jury was impaneled (*See,* 2 RR 10-11, 188-192). At the conclusion of the evidence, the trial court submitted the case to the jury in the Charge of the Court (*See,* CR 373-87; 2 CR 127-41; 6 RR 167-71). On November 24, 2014, the Jury returned a verdict in favor of Appellee and against ETMC (CR 373-87; 2 CR 127-41; 6 RR 225-28). On November 26, 2014, Appellee filed his Motion for Judgment on the Verdict (CR 388-471; 2 CR 142-225). On December 2, 2014, Appellee filed his First Amended Motion for Judgment on the Verdict (CR 472-556; 2 CR 226-54). On December 16, 2014, ETMC filed its Response to Appellee's First Amended Motion for Judgment on the Verdict and Motion for Judgment *Non Obstante Veredicto* (CR 557-737; 3 CR 61-241).

**Trial court's disposition:** On December 23, 2014, the trial entered court its Final Judgment granting Appellee judgment on the jury verdict (CR 738-41; 3 CR 242-45).

**Appeal:** Appellant timely filed its Notice of Appeal on January 21, 2015 (CR 1078-1085; 5 CR 82-89).

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Rule 39 of the TEXAS RULES OF APPELLATE PROCEDURE, Appellant East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services requests that this matter be submitted for oral argument to allow the Court to more completely understand the facts and legal issues presented by this appeal.

## ISSUES PRESENTED

I.   JUDGMENT IN FAVOR OF APPELLEE SHOULD BE REVERSED BECAUSE THERE IS LEGALLY INSUFFICIENT EVIDENCE OF PROXIMATE CAUSE AGAINST ETMC, AND;

II.  JUDGMENT IN FAVOR OF APPELLEE SHOULD BE REVERSED BECAUSE THERE IS LEGALLY INSUFFICIENT EVIDENCE OF THE APPLICABLE STANDARD OF CARE AND BREACH BY ETMC.

## STATEMENT OF FACTS

## I.   THE KEY CONTENTIONS, TRIAL COURT RULING AND EVIDENCE AT TRIAL:

### A.   Appellee's Contention and Evidence:

#### 1.   Appellee's Contention:

Appellee contended that Ms. Delaune should have been restrained while being transported in ETMC's ambulance on August 19, 2012 (2 RR 212; 6 RR 179). Ms. Moore and Ms. Spurgers (hereinafter also referred to collectively as "the EMS Providers") were the ETMC employees in the ETMC ambulance at that time (*See,* CR 6; 1 CR 10). Appellee claimed Ms. Delaune was not restrained solely because ETMC failed to train Ms. Moore and Ms. Spurgers on the use of restraint (*See,* 6 RR 51, lines 10-16).

The trial focused on ETMC's training as related to the use of restraint outlined in its Behavioral Disorders Policy ("the Behavioral Policy")(12 RR 6 [Pl. Ex. 9]). Specifically, Appellee represented to the trial court and jury that the "narrow" issue was whether or not ETMC had trained the EMS Providers on aspects of the Behavioral Policy that involved the use of chemical and physical restraint in handling patients like Ms. Delaune (*See,* 3 RR 173, lines 20-23—"THE COURT: Sounds like your expert was saying they didn't train them very well. MR. KREBS: With regard to restraints. With regard to restraints only"; 3 RR 174, lines 10-11—"Ours [criticism] is narrowly directed at teaching restraint is what it's all about [sic]." *See also,* 2 RR 206, line 23 – 207, line 14; 6 RR 173, lines 11-18; 179, lines 6-13; 182, lines 3-7).

This alleged "failure to train" was Appellee's only complaint against ETMC. Appellee represented to the trial court and jury that he had no complaint about the Behavioral Policy itself (*See,* 5 RR 109, line 23- 110, line 2; 6 RR 126, lines 8-21).

At trial, Appellee produced no evidence regarding the standard of care applicable to the EMS Providers when they cared for Ms. Delaune. Appellee also produced no evidence of any breach of the applicable standard of care by the EMS Providers.

The Charge of the Court ("the Charge") submitted at the close of evidence only asked whether or not ETMC's negligence, if any, was a proximate cause of Appellee's alleged injuries (CR 376; 2 CR 130). With respect to ETMC's alleged negligence, the Charge defined negligence and ordinary care only in regards to ETMC's conduct with respect to the formulation, implementation and enforcement of its policies and procedures (CR 374-75; 2 CR 128-29). The Charge did not submit the EMS Providers' conduct, and it did not define negligence as to ETMC in terms of any action or failure to act by the EMS Providers (CR 373-87; 2 CR 127-41). Appellee neither requested that the EMS Providers' conduct be submitted for determination, nor did he object to the failure of the Charge to submit these matters for determination (*See,* 6 RR 150-159).

## 2. Appellee's Evidence:

Appellee relied on his retained expert, Dr. Marvin Wayne, to support his failure to train claim. Dr. Wayne offered the following testimony on ETMC's alleged failure to train:

- With respect to the Behavioral Policy, the Behavioral Policy was reasonable and he was not critical of the Behavioral Policy itself (3 RR 28 line 10-25; 3 RR 90, lines 8-17);

7

- "My concern is that – and my feeling where the failure of the standard of care occurred is that *if the EMS providers only knew to talk-down*, they had not been taught [other techniques]" (3 RR 36, lines 6-9)(emphasis added);
- "The paperwork says: This is what we teach. The knowledge based by the two EMS providers – not one but two – say, 'That's not what we knew'" (3 RR 43, lines 2-5), and;
- He agreed ETMC's education and training program tracked the requirements of the national registry for EMS provider certification (3 RR 82, lines 11-19).

According to Appellee's expert, ETMC was negligent only "if the EMS providers only knew to talk-down." Appellee's expert concluded the EMS Providers' only knew to "talk-down" and did not know about restraint because (1) they did not restrain Ms. Delaune and (2) they did not mention restraint in their depositions (3 RR 60, lines 13-18; 3 RR 74, lines 14-20). Dr. Wayne offered no other facts and nothing more specific in support of his opinion that ETMC failed to train the EMS Providers on the use of restraint.

### 3. Significant Pretrial Ruling by Trial Court:

Appellee named the EMS Providers as defendants in his original petition (CR 1; 1 CR 5). Appellee alleged the EMS Providers were negligent because they failed to restrain Ms. Delaune (CR 6; 1 CR 10).

The EMS Providers moved for summary judgment on Appellee's claims against them on both a "traditional" and a "no evidence" basis (CR 36-298; 1 CR 40-250; 2 CR 5-23). Their request for dismissal was based on the fact that the evidence conclusively established they did not violate the applicable standard of care in their care and treatment of Ms. Delaune and there was no evidence they violated the standard of care in their care

8

and treatment of Ms. Delaune. Appellee responded to this motion (CR 299-335; 2 CR 53-89).

On July 29, 2014, the trial court entered an order granting the EMS Providers' motion for summary judgment (CR 365-66; 2 CR 119-120). Specifically, the trial court ordered that all claims against Ms. Moore and Ms. Spurgers "are dismissed with prejudice" (CR 365; 2 CR 119). Thus, prior to trial, the EMS Providers' conduct in caring for Ms. Delaune was determined to not be negligent as a matter of law. Stated another way, the trial court determined that as a matter of law the EMS Providers did not depart from any applicable standard of care in their care and treatment of Ms. Delaune.

**B.      Evidence of ETMC's Training and the EMS Providers' Knowledge Beyond "Talk-Down":**

Evidence about ETMC's training on restraint and the EMS Providers' knowledge about the utilization of restraint when speaking with a patient was no longer effective was presented through the testimony of Ms. Moore, Ms. Spurgers, Dr. Paul Lehrfeld (ETMC's expert), Dr. William Moore (ETMC's Medical Director), and Dr. Wayne (Appellee's expert), as well as documents showing ETMC had trained Ms. Moore and Ms. Spurgers on the use of restraint. In review of this testimony, the Court should keep in mind that at the time of Ms. Delaune's death Ms. Moore was the ETMC employee with Ms. Delaune in the back of the ambulance. Ms. Spurgers was in the front of the ambulance driving. (*See*, 4 RR 43, lines 14-18; 44, lines 6-14).

The significant testimony and documentary evidence offered by each witness about ETMC's training and Ms. Moore and Ms. Spurgers' knowledge of restraint is set forth below:

1. **Ms. Moore:**

- The Behavioral Policy discusses use of restraints (2 RR 242, lines 5-7; 3 RR 96, lines 2-5);
- In paramedic school, she was taught about the use of chemical and physical restraints (3 RR 129, lines 7-21; 3 RR 145, line 25 – 146, line 16);
- Since about 1996, she has been certified as a paramedic by the State of Texas and the United States' national paramedic registry (3 RR 133, line 23 – 134, line 1; 3 RR 129, line 22 – 130, line 6);
- To obtain each certification, she had to pass testing (3 RR 131, line 6 – 132, line 18);
- To maintain each certification, every two and four years, she has to take book classes, hands-on classes and pass testing (3 RR 134, lines 2-20);
- To obtain and maintain each certification, she had/has to demonstrate her competency regarding the use of restraints through testing (3 RR 133, lines 5-15);
- Ms. Moore has continuously and successfully recertified in Texas and nationally since 1996 (3 RR 134, lines 22-25);
- Before working at ETMC or going to paramedic school, Ms. Moore worked at Rusk State Hospital ("Rusk"), a psychiatric facility, for 13 years (3 RR 135, line 25 – 136, line 5; 3 RR 137, lines 2-5);
- Ms. Moore employed restraint techniques on a daily basis in her management of patients during the 13 years she worked at Rusk (3 RR 139, lines 5-12);
- During her 13 years at Rusk, Ms. Moore was trained in the use of chemical and physical restraints (3 RR 140, lines 19-24);
- During Ms. Moore's 13 years at Rusk she also taught the use of chemical and physical restraints (3 RR 141, line 22 – 142, line 10);
- The restraint concepts Ms. Moore used, learned and was taught at Rusk were the same techniques she was taught and

learned in paramedic school (3 RR 145, lines 4-11; 3 RR 150, lines 16-20);

- Since 1996, Ms. Moore has been with ETMC (3 RR 152, lines 18-25);
- When Ms. Moore was oriented at ETMC after being hired, she was trained on the use of restraints (3 RR 156, line 19 – 157, line 10);
- Ms. Moore's orientation at ETMC was consistent with what she had been taught and what she had learned about the use of restraint at Rusk and in paramedic school (3 RR 156, line 19 – 157, line 10);
- Use of restraints have also been covered since 1996 in continuing education provided through ETMC (3 RR 157, lines 11-19; 3 RR 158, line 10 – 160, line 13; 3 RR 161, line 8 – 162, line 8; 3 RR 162, line 24 – 163, line 1; 3 RR 163, lines 14-20);
- Ms. Moore also received education and training through "Ninth Brain" at ETMC (3 RR 164, lines 12-18);
- Her Ninth Brain documentation shows education and training on the use of restraints while she has been at ETMC (3 RR 164, line 21 – 167 , line 6);
- While at ETMC, Ms. Moore has been tested annually on its protocols (3 RR 167, line 19 – 168, line 5);
- Ms. Moore has passed all of these tests (3 RR 168, line 11-12);
- A copy of the Behavioral Policy is kept in ETMC's ambulances (3 RR 168, lines 20-24);
- ETMC's reviews of Ms. Moore document that she "has a good understanding of the policies and procedures we use" (3 RR 174, lines 17-24);
- In response to a direct question from Appellee's counsel, Ms. Moore discussed what she was "taught or trained" regarding the use of soft restraints mentioned in the Behavioral Policy (2 RR 242, line 15 – 243, line 5; 2 RR 244, lines 5-8);
- In response to a direct question from Appellee's counsel, Ms. Moore also testified that during Ms. Delaune's ambulance transport, she could have put Ms. Delaune in restraints if she felt that was necessary (3 RR 120, lines 21-24);

- Ms. Moore testified that she believed her care of Ms. Delaune was consistent with the Behavioral Policy (3 RR 202, lines 13-16);
- Ms. Moore's ETMC personnel file documents that she properly followed ETMC protocols (14 RR 40, 43, 48, 54, 59 [Pl. Ex. 20]), and;
- Ms. Moore provided documentation of training in 2010 and on April 17, 2012 that covered behavioral crises and restraint (3 RR 166, line 3 – 167, line 6; 13 RR 16 [Pl. Ex. 15]; 20 RR 9, 15 [Def. Ex. 31]).

2.    **Ms. Spurgers:**

- Ms. Spurgers was the ambulance driver on the occasion in question (4 RR 43, lines 14-18);
- Ms. Spurgers went to paramedic school (4 RR 44, lines 18-20);
- Ms. Spurgers was trained in paramedic school and at ETMC about the use of restraints (4 RR 44, line 22 – 45, line 1; 4 RR 52, lines 7-15; 4 RR 60, lines 17-22; 4 RR 61, line 12 – 62, line 1; 4 RR 64, lines 12-20);
- Ms. Spurgers has been employed by ETMC since 2003 (4 RR 6, lines 5-15);
- Ms. Spurgers had been taught about the use of restraints by ETMC prior to the incident involved here (4 RR 15, lines 2-19; 4 RR 38, line 25 – 39, line 10);
- Ms. Spurgers' ETMC personnel file documents that she properly followed ETMC protocols (13 RR 56, 61, 66, 71, 82 [Pl. Ex. 19]), and;
- Ms. Spurgers provided documentation of training on October 4, 2010 and April 17, 2012 covering behavioral crises and restraint (4 RR 61, line 12 – 62, line 1; 13 RR 26 [Pl. Ex. 16]; 20 RR 19, 25 [Def. Ex. 32]).

3.    **Dr. Lehrfeld:**

- ETMC provided Ms. Moore and Ms. Spurgers continuing education during their time with it that covered chemical restraint and physical restraint (5 RR 62, line 4 – page 63, line 7; 64, line 18 – page 65, line 10; 68, line 18 – 69, line 13);
- The education and training of providers like Ms. Moore and Ms. Spurgers is universal and follows a standardized national

curriculum, in that it is focused on national guidelines set by the national registry (5 RR 60, line 5 – 62, line 25), and;

- ETMC's education and training on the use of restraints is in line with the applicable standardized national curriculum (5 RR 62, lines 1-7; 65, lines 11-19; 68, line 18 – page 69, line 13).

4.  **Dr. Moore:**

- He is an emergency room physician and the medical director for the ETMC Emergency Medical Services (6 RR 54, line 22- 55, line 4);

- He has been the medical director of ETMC Emergency Medical Services since the fall of 1989 (6 RR 55, lines 5-7);

- He is personally involved in the education and training of the EMS personnel (6 RR 66 lines 4-25);

- He has also served as the medical director of college-based paramedic training programs in Tyler and Waco (6 RR 72, lines 6-23);

- There is a standardized national curriculum that is followed in the teaching of paramedics in paramedic school (6 RR 88, lines 8-14);

- During their paramedic school training, Ms. Moore and Ms. Spurgers would have been trained consistent with the standardized national curriculum established by the national registry and certification requirements (6 RR 89, line 21 – 90, line 1);

- At ETMC Ms. Moore and Ms. Spurgers would be educated and trained through orientation, continuing education, Ninth Brain education, and testing on protocols (6 RR 93, lines 2-4; 6 RR 94, line 20 – 95, line 18; 6 RR 112, lines 9-22);

- The training Ms. Moore and Ms. Spurgers received while they have been at ETMC is consistent with the standardized national curriculum established by the national registry and certification requirement s (6 RR 90, lines 2-6; 6 RR 92, lines 7-16; 6 RR 96, line 1-9; 6 RR 113, lines 10-17);

- Ms. Moore and Ms. Spurgers had to pass written examinations to obtain and maintain their national and Texas certification as paramedics (6 RR 90, line 7 – 91, line 2);

- This testing would cover the use of restraint (6 RR 91, lines 7-11);

- ETMC's education and training covers the use of restraints (6 RR 96, lines 10-20);

- ETMC provided documentation showing live training on "Behavioral Crises and Restraint" in April-May 2012, within four months of this incident (20 RR 30 [Def. Ex. 37]);
- Ms. Moore and Ms. Spurgers attended this training (3 RR 166-67; 4 RR 61; 20 RR 15 [Def. Ex. 31]; 20 RR 25 [Def. Ex. 32]);
- Dr. Moore gave a Power Point program on behavioral emergencies that covered the use of restraints six months before this incident (6 RR 97, line 20 – 98, line 13; 6 RR 105, lines 11-23; 6 RR 106, line 4 – 107, line 17);
- The concluding five slides of Dr. Moore's 2012 Power Point presentation specifically addressed and covered the use of restraints in behavioral emergencies like Ms. Delaune's (20 RR 81-85 [Def. Ex. 38]);
- ETMC's education and training on the use of restraint is consistent with the national registry's position on the use of restraint (6 RR Exhibit 105, line 24 – 106, line 3), and;
- ETMC does not teach the talk-down technique only (6 RR 102, line 24 – 103, line 7).

5. **Dr. Wayne:** In addition to the testimony set forth above, Dr. Wayne:

- Agreed that after their completion of paramedic school, Ms. Moore and Ms. Spurgers would have been trained on the use of restraints (3 RR 51, line 2 – 3 RR 52, line 9; 3 RR 54, lines 9-15);
- Agreed that a standardized national curriculum exists in the education and training of providers like Ms. Moore and Ms. Spurgers (3 RR 52, line 11-23; 3 RR 53, lines 4-13);
- Agreed that this standardized national curriculum covers the use of chemical and physical restraints (3 RR 53, lines 18-22), and;
- Agreed that ETMC's education and training program tracks what is required by the national registry for provider certification (3 RR 82, lines 11-19).

## II. THE VERDICT, POST-TRIAL MOTIONS, FINAL JUDGMENT AND NOTICE OF APPEAL:

On November 24, 2014, the Jury returned a verdict in favor of Appellee and against ETMC (CR 373-387; 2 CR 127-141).

**14**

On November 24, 2014, Appellee filed his Motion for Judgment on the Verdict (CR 388-471; 2 CR 142-225). On December 2, 2014, Appellee filed his First Amended Motion for Judgment on the Verdict (CR 472-500; 2 CR 226-254).

On December 16, 2014, ETMC filed its Response to Appellee's First Amended Motion for Judgment on the Verdict and Motion for Judgment *Non Obstante Veredicto* ("JNOV") (CR 557-737; 3 CR 61-241). In its response and motion for JNOV, ETMC submitted that the trial court should enter judgment in favor of ETMC notwithstanding the verdict because (1) there was no evidence of causation against ETMC because neither Ms. Moore nor Ms. Spurgers was negligent on the occasion in question and (2) Appellee presented no evidence or legally insufficient evidence that ETMC failed to train either Ms. Moore or Ms. Spurgers.

On December 23, 2014, the trial court entered Final Judgment in favor of Appellee based on the jury verdict (CR 738-41; 3 CR 242-45).

On January 21, 2015, ETMC timely filed its Notice of Appeal (CR 1078-1085; 5 CR 82-89).

## SUMMARY OF ARGUMENT

This is solely a "failure to train" case. At trial Appellee contended the narrow issue was ETMC had failed to teach the EMS Providers on the use of restraints in handling behavioral emergencies like Ms. Delaune's (*See*, 3 RR 174, lines 10-11). Appellee presented no other complaint about ETMC, and presented no evidence that would support any other basis of liability against ETMC.

Under Texas law, an employer's alleged failure to train an employee can be a proximate cause of a claimant's alleged injuries only if the employee "committed an actionable tort" on the occasion in question. If the employee did not commit an actionable tort, an employer's failure to train cannot be a proximate cause of a claimant's alleged injuries as a matter of law. Because it was determined prior to trial that the EMS Providers were not negligent, as a matter of law any failure to train by ETMC could not be a proximate cause of Appellee's alleged injuries. For this reason, Appellee has legally insufficient evidence of causation and the trial court erred in failing to grant ETMC's JNOV.

There is also legally insufficient evidence that ETMC failed to train Ms. Moore and Ms. Spurgers on the use of restraint. First, the testimony of Appellee's expert, Dr. Marvin Wayne, constitutes no evidence of the applicable standard of care or a failure to train by ETMC because he offered nothing more than conclusory, *ipse dixit* statements in support of this vital fact. Second, the evidence conclusively establishes the EMS Providers knew about the use of restraint and ETMC trained them on the use of restraint. Third, Dr. Wayne's opinion involves improper inference-stacking. For these reasons,

Appellee has legally insufficient evidence of the standard of care and breach by ETMC and the trial court erred in failing to grant ETMC's JNOV.

Accordingly, the Tyler Court of Appeals should reverse the trial court's December 23, 2014 Final Judgment in favor of Appellee and against ETMC and render a take nothing judgment in favor of ETMC and against Appellee.

## ARGUMENT

## STANDARD OF REVIEW

The denial of EMTC's JNOV and ETMC's contention that there is legally insufficient evidence to support the verdict and judgment against it are both reviewed under the same standard. *See, Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 215 (Tex. 2011); *Tanner v. Nationwide Mutual Fire Ins. Co.,* 289 S.W.3d 828, 830 (Tex. 2009); *Vaughn v. Drennon,* 372 S.W.3d 726, 731 (Tex. App.—Tyler 2012, no pet.). The applicable standard of review is the "legal sufficiency standard." *See, id.*

Evidence is legally insufficient under this standard of review when one or more of the following circumstances exist:

1. The record discloses a complete absence of a vital fact;
2. The court is barred by rules of law or rules of evidence from giving weight to the only evidence offered to prove a vital fact;
3. The evidence offered to prove a vital fact is no more than a mere scintilla, or;
4. The evidence establishes conclusively the opposite of a vital fact.

*City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005); *Crown Pine Timber 1, L.P. v. Durrett,* 2012 Tex. App. LEXIS 3658 *8-9 (Tex. App.—Tyler)(May 9, 2012)(no pet.)(mem. op.). As more fully explained below in Paragraphs I and II, one or more of these circumstances exist in this case.

While the general rule associated with a legal sufficiency standard of review is to view the evidence in the light favorable to the verdict and to disregard contrary evidence, unless reasonable jurors could not, exceptions exist where appellate courts should consider contrary evidence. *See, City of Keller,* 168 S.W.3d at 810-11.

First and foremost, when an appellate court reviews the evidence in a legal sufficiency challenge, the evidence "cannot be considered in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with the other evidence." *AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex. 2008)(citing *City of Keller,* 168 S.W.3d at 827). Evidence also cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. *City of Keller,* 168 S.W.3d at 812. Further, inference stacking cannot create or provide legally sufficient evidence. *See, Marathon Oil Corp. v. Pitzner,* 106 S.W.3d 724, 728 (Tex. 2003).

Second, a number of circumstances exist that require the Court to consider evidence beyond that which supports the verdict. These circumstances are because (1) ETMC asserts Appellee's evidence of standard of care and breach is incompetent, (2) Appellee relies on circumstantial evidence under which the circumstances are equally consistent with either of two facts, (3) Appellee relies on Ms. Moore and Ms. Spurgers' conscious knowledge of restraint at the time they cared for Ms. Delaune, and (4) ETMC asserts the evidence conclusively establishes that ETMC did train the EMS Providers on the use of restraint. *See, City of Keller,* 168 S.W.3d at 812-17.

I.     **JUDGMENT IN FAVOR OF APPELLEE SHOULD BE REVERSED BECAUSE THERE IS LEGALLY INSUFFICIENT EVIDENCE OF PROXIMATE CAUSE AGAINST ETMC:**

A.     **Essential Elements of a Failure to Train Case:**

Appellee's sole claim against ETMC is that it failed to train the EMS Providers on the use of restraint. The essential elements of Appellee's failure to train claim against ETMC are:

- ETMC owed a legal duty to train its employees;
- ETMC breached that duty, and;
- ETMC's breach proximately caused the Appellee's injuries.

*See, Wal-Mart Stores, Inc. v. Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 *16 (Tex. App.—San Antonio)(Jun. 11, 2003)(pet. denied)(mem. op.)(citing *LaBella v. Charlie Thomas, Inc.,* 942 S.W.2d 127, 137 (Tex. App.—Amarillo 1997, writ denied)); *Gonzales v. Willis,* 995 S.W.2d 729, 739-40 (Tex. App.—San Antonio 1999, no pet.), *overruled in part on o.g., Hoffman-LaRoche v. Zeltwanger,* 155 S.W.3d 438 (Tex. 2004).

**B.      Proximate Cause Requires Actionable Tort By Employee:**

In order for an employer's failure to train to be a proximate cause of a claimant's injury, its employee must have committed an actionable tort on the occasion in question. *See, Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 at *16 (citing *Gonzales v. Willis,* 995 S.W.2d at 739-40). *See also, Goodarzi v. Hartzog,* 2013 U.S. Dist. LEXIS 85727 *50-51 (S.D. Tex.)(Jun. 14, 2013)(applying Texas law); *Udoewa v. Plus 4 Credit Union,* 2009 U.S. Dist. LEXIS 54964 *22 (S.D. Tex.)(Jun. 29, 2009)(applying Texas law); *Host Marriott Corp. v. Meadows,* 2001 Tex. App. LEXIS 4409 *4-6 (Tex. App.—Dallas)(Jun. 20, 2001)(pet. denied)(not designated for publication). This means that in order for Appellee to prevail on his failure to train claim against ETMC, he had to prove the EMS Providers committed an actionable tort when caring for Ms. Delaune.

Because recovery is predicated on the employee's commission of an actionable tort, claims for negligent hiring, supervision, training and retention are referred to as "dependent torts." *See, Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 at *16. That is to say, the existence of Appellee's failure to train claim against ETMC is "dependent" on

the EMS Providers' commission of an actionable tort when they were caring for Ms. Delaune. *See, The Methodist Hospital v. German,* 369 S.W.3d 333, 350 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)("…German could not show he was harmed by the hospital's failure to train unless it resulted in both the nurses' failure to conform to the proper standard of care and his injury"). *See also, Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 at *16.

While the Texas Supreme Court has not specifically addressed whether the employee's commission of an actionable tort is necessary in the dependent tort of negligent training, it has addressed this requirement in the dependent torts of negligent hiring and negligent supervision. In *Wansey v. Hole,* 379 S.W.3d 246 (Tex. 2012), the Texas Supreme Court held that "some harmful or negligent conduct of an employee" is required to recover under the dependent torts of negligent hiring and negligent supervision. *Id.* at 246.

There is no reason to expect the Texas Supreme Court would not impose this same actionable tort requirement when presented with a negligent training claim. In fact Texas state and federal courts uniformly interpret *Wansey* as requiring the employee commit an actionable tort in all dependent torts, including negligent training. *See, Hughes v. Yodle, Inc.,* 2015 U.S. Dist. LEXIS 63011 *16 (W.D. Tex.)(May 14, 2015); *Allen v. Wal-Mart Stores Texas, LLC,* 2015 U.S. Dist. LEXIS 56425 *17 (S.D. Tex.)(Apr. 29, 2015); *Clark v. PFPP Limited Partnership,* 455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no pet.); *Lermon v. Minyard Food Stores, Inc.,* 2014 Tex. App. LEXIS 12498 *23-24 n. 7 (Tex. App.—Dallas)(Nov. 19, 2014)(pet. filed)(mem. op.). Courts in other jurisdictions that

have addressed this issue in the dependent torts of negligent hiring, supervision, training and retention have also held that the employee must have committed a tort on the occasion in question. *See, Rogala v. District of Columbia,* 161 F.3d 44, 56 n.9 (D.C. Cir. 1998)(applying D.C. law); *Thrasher v. Ivan Leonard Chevrolet, Inc.,* 195 F.Supp.2d 1314, 1319-20 (S.D. Ala. 2002)(applying Alabama law); *Schoff v. Combined Ins. Co. of America,* 604 N.W.2d 43, 53 (Iowa 1999); *Stevenson v. Precision Standard, Inc.,* 762 So.2d 820, 824-25 (Ala. 1999); *Haverly v. Kaytec, Inc.,* 738 A.2d 86, 91 (Vt. 1999); *Mulhern v. City of Scottsdale,* 799 P.2d 15, 18 (Ariz App. 1990); *Hogan v. Forsyth Country Club Co.,* 340 S.E.2d116, 124 (N.C. App. 1986); *Louis Marsch, Inc. v. Pekin Ins. Co.,* 491 N.E.2d 432, 437 (Ill. App. 1985); *Texas Skaggs, Inc. v. Joannides,* 372 So.2d 985, 987 (Fla. App. 1979); *Tindall v. Enderle,* 320 N.E.2d 764, 767-68 (Ind. App. 1974).

The actionable tort requirement in a negligent training claim is a logical and reasonable essential element because, otherwise, the alleged improper training of an employee by an employer could not result in injury to another. Put another way, how and why could an employer be liable for the failure to train an employee when that employee was not negligent on the occasion in question? More importantly, what legal and public policy reason would justify holding an employer liable for a failure to train when the employee did not breach any duty owed on the occasion in question?

This requirement is also consistent with the definition of "proximate cause" in the Charge. Specifically, the Charge instructed that ETMC's negligence had to be "a

substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred" (CR 375; 2 CR 129).

Under this definition of proximate cause, how could ETMC's failure to train the EMS Providers be a substantial factor in bringing about Ms. Delaune's death unless they breached an applicable standard of care when caring for Ms. Delaune? Similarly, a failure to train by ETMC could only be a "but for" cause of Ms. Delaune's death if the EMS Providers departed from an applicable standard of care when caring for Ms. Delaune.

According to the legal requirement that commission of an actionable tort by the employee is a vital fact of Appellee's negligent training claim against ETMC, three of the four circumstances under which evidence is legally insufficient exist here. Because the trial court ruled prior to trial that the EMS Providers were not negligent as a matter of law, (1) the evidence conclusively establishes the opposite of this vital fact, (2) the trial court was barred by Texas law in giving any weight to any evidence Appellee may have offered at trial to prove this vital fact, and (3) there is a complete absence of this vital fact.

### C. Appellee's Reliance on *Lacroix v. Denton Regional Medical Center* is Misplaced:

ETMC anticipates Appellee will argue *Denton Regional Medical Center v. Lacroix,* 947 S.W.2d 941 (Tex. App.—Fort Worth 1997, pet. dism'd by agmt.), establishes Texas law does not require that an employee commit an actionable tort in order for the employer to be liable in an failure to train claim. Appellee's reliance on

*Lacroix* is misplaced because a careful reading of *Lacroix* shows that it does not stand for this proposition.

First and foremost, *Lacroix* is not a failure to train case. It is also not a negligent hiring, retention or supervision case. The issue in *Lacroix* was that the hospital required an anesthesiologist be present for all deliveries, but one was not present for Ms. Lacroix's delivery. *See*, *id.* at 949-50. As such, *Lacroix* is neither binding nor persuasive precedent because it does not involve a "dependent" tort. *See, Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 at *16. Further, *Lacroix* is a Fort Worth Court of Appeals opinion and a petition for review filed by the hospital was dismissed by agreement before it was addressed by the Texas Supreme Court.

In addition to *Lacroix's* petition for review history, the fact that *Lacroix* was decided in 1997 is also significant. This is significant because in 2012 the Texas Supreme Court addressed the dependent torts of negligent hiring and negligent supervision in *Wansley.* When the Texas Supreme Court addressed these dependent torts in *Wansley,* it held that negligent conduct by the employee was a predicate to recovery. *Wansley,* 379 S.W.3d at 246. As such, *Wansley* really controls disposition of this appeal because it directly addresses dependent torts like a failure to train claim.

### D. *Latimer v. Memorial Hermann Hospital System* Support ETMC's Position:

The Fourteenth District Court of Appeals' decision in *Latimer v. Memorial Hermann Hospital System,* 2011 Tex. App. LEXIS 423 (Tex. App.—Houston [14th Dist.])(Jan. 20, 2011)(no pet.)(mem. op.) is instructive and persuasive authority

supporting ETMC's argument in this point of error. In *Latimer* plaintiff asserted a claim based on the dependent tort of negligent supervision. Memorial Hermann Hospital moved for summary judgment wherein it established that the employee at issue committed no actionable tort against plaintiff. The trial court granted Hermann's motion. On appeal the Fourteenth District Court of Appeals held that plaintiff's claim was properly dismissed because "there is no actionable tort to support the negligent supervision claim." *Id.* at *9-10.

The same situation exists here. Appellee asserted the dependent tort of failure to train. Texas law requires that Appellee establish one or both of the EMS Providers committed an actionable tort against Ms. Delaune. *See, Aguilera-Sanchez,* 2003 Tex. App. LEXIS 4846 at *16 (citing *Gonzales,* 995 S.W.2d at 739-40); *German,* 369 S.W.3d at 350. *See also, Wansley,* 379 S.W.3d at 246; *Host Marriott Corp.,* 2001 Tex. App. LEXIS 4409 at *4-6. Prior to trial, however, the trial court ruled that as a matter of law neither Ms. Moore nor Ms. Spurgers committed a tort in their care of Ms. Delaune (CR 365-66; 2 CR 119-120). In fact, the court granted summary judgment in favor of the EMS Providers on Appellee's claim they were negligent in failing to restrain Ms. Delaune (*See,* CR 33; 1 CR 37). Thus, as in *Latimer,* Appellee cannot recover from ETMC because no actionable tort exists to support his failure to train claim. *See, Latimer*, 2011 Tex. App. LEXIS 423 at *9-10.

As such, ETMC is entitled not only to reversal of the Final Judgment against it and in favor of Appellee, but it is entitled to rendition of judgment in favor of it and against

Appellee because there is legally insufficient evidence of proximate cause to support Appellee's failure to train claim.

## II. JUDGMENT IN FAVOR OF APPELLEE SHOULD BE REVERSED BECAUSE THERE IS LEGALLY INSUFFICIENT EVIDENCE OF THE APPLICABLE STANDARD OF CARE AND BREACH BY ETMC:

### A. Appellee's Burden:

In health care liability claims like this matter, the threshold issue that must be established is the applicable standard of care. *See, Ortegon v. Benavides,* 2008 Tex. App. LEXIS 1576 *13 (Tex. App.—San Antonio)(Mar. 5, 2008)(pet. denied)(mem. op.)(citing *Jones v. Miller,* 966 S.W.2d 851, 854 (Tex. App.—Houston [1st Dist.] 1998, no pet.)); *Cobb v. Dallas Fort Worth Medical Center,* 48 S.W.3d 820, 825 (Tex. App.—Waco 2001, not pet.). The plaintiff in a health care liability claim has the burden at trial to establish the applicable standard of care; the actual specifics of duty owed by the health care provider to the patient. *See, Jackson v. Axelrad,* 221 S.W.3d 650, 655 (Tex. 2007); *Morrell v. Finke,* 184 S.W.3d 257, 271 (Tex. App.—Fort Worth 2005, pet. denied). Establishing the applicable standard of care is essential because without that information the fact finder cannot determine if the facts show the defendant breached the standard of care. *See, Kingwood Pines Hospital, LLC v. Gomez,* 362 S.W.3d 740, 747 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Ortegon,* 2008 Tex. App. LEXIS 1576 at *13; *Nichols v. Nacogdoches Hospital District,* 96 S.W.3d 582, 586 (Tex. App.—Tyler 2002, no pet.).

While in general terms the standard of care applicable to ETMC is to do what an ordinarily prudent emergency medical services provider would do under the same or similar circumstances, a statement of this nature is not sufficient to establish the

applicable standard of care.  Specific factual information is required to establish the applicable standard of care and a resulting breach of that standard.  *See, Kingwood Pines Hosp.,* 362 S.W.3d at 747; *Shaw v. BMW Healthcare, Inc.,* 100 S.W.3d 8, 13-14 (Tex. App.—Tyler 2002, pet. denied); *Nichols,* 96 S.W.3d at 586; *Gonzales v. Sid Peterson Memorial Hospital,* 2000 Tex. App. LEXIS 3137 *5 (Tex. App.—San Antonio)(May 17, 2000)(pet. denied)(mem. op.).  In particular, plaintiff is required to provide specific factual information about what the defendant should have done differently.  *See, id.*

To establish the applicable standard of care, factual information must be provided that describes the steps needed to comply with the applicable standard of care.  For example, when establishing the standard of care applicable to a radiologist for reading a mammogram, a statement that the radiologist should "examine the mammogram x-rays and report the results in a written report" is not sufficient.  *See, Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex. App.—El Paso, 1995, writ denied).  To establish the standard of care there must be more factual detail.  For example, the steps taken to properly read the x-ray must be described and a description of what should be contained in an adequate report must be provided.  *Id.*

Similarly, simple assertions that a health care provider failed to do something is not sufficient.  *See, Shaw,* 100 S.W.3d at 14.  More factual detail is required such as what are appropriate actions under the circumstances or what factually should have been done differently to comply with the applicable standard of care.  *Id.*

In a failure to train claim, plaintiff is required to prove that a reasonably prudent employer would have provided training beyond that which was given.  *See, Lermon,* 2014

Tex. App. LEXIS 12498 at *25; *Dangerfield v. Ormsby,* 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.); *Patino v. Complete Tire, Inc.,* 158 S.W.3d 655, 661 (Tex. App.—Dallas 2005, pet. denied); *Allsup's Convenience Stores, Inc. v. Warren,* 934 S.W.2d 433, 437 (Tex. App.—Amarillo, 1996, writ denied).   Plaintiff is also required to provide "factual proof" of specific training that the employer should have provided but didn't.  *Allsup's Convenience Stores, Inc.,* 934 S.W.2d at 437.  Simply saying ETMC "failed to train" the EMS Providers is not enough to establish the applicable standard of care.  *See, Shaw,* 100 S.W.3d at 14; *Chopra,* 892 S.W.2d at 233. This form of standard of care evidence is insufficient because it is conclusory and *ipse dixit* in nature.  *See, Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010); *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999).

### B.    Appellee's Evidence:

Appellee relied on his retained expert Dr. Wayne to establish the standard of care applicable to ETMC in training Ms. Moore and Ms. Spurgers on the use of restraint and to establish a breach of that standard of care.  Dr. Wayne's only specific testimony about the applicable standard of care was a statement that EMS providers should be trained that if "talk down" does not work, physical or chemical restraint is used (3 RR 28, lines 4-9). Dr. Wayne later mentioned making sure employees understood what they were being taught, but provided no further facts, details or specifics relevant to this opinion (*See,* 3 RR 36, lines 1-3; 62, lines 6-9).

With respect to ETMC's breach of the standard of care, Dr. Wayne testified it was his opinion ETMC did not train the EMS Providers on the use of restraint because

(1) they did not restrain Ms. Delaune, and (2) they did not mention restraint in their pre-trial depositions (3 RR 60, lines 13-18; 3 RR 74, lines 14-20).

Dr. Wayne's testimony was wholly based on inferences and not on any facts related to ETMC's actual training of the EMS Providers. Significantly, Dr. Wayne failed to provide any facts about what specifically ETMC should have done differently or about what training ETMC should have provided, but failed to provide.

Dr. Wayne simply inferred the EMS Providers were not trained because they did not discuss the use of restraint in their depositions and because they did not restrain Ms. Delaune. As shown below, this is legally insufficient evidence of the applicable standard of care and breach of any standard of care by ETMC.

**C.    Appellee's Evidence is Legally Insufficient Evidence of Applicable Standard of Care and Breach by ETMC:**

**1.    Conclusory and *ipse dixit* testimony and inference stacking is legally insufficient evidence:**

Expert testimony that is conclusory and *ipse dixit* in nature is incompetent evidence and cannot support a jury verdict or judgment. *See, City of San Antonio v. Pollock,* 284 S.W.3d 809, 816, 818 (Tex. 2009). A party may complain about conclusory and incompetent evidence on appeal, even if no objection was asserted at trial. *See, id.* at 816 (citing *Coastal Transportation Co. v. Crown Central Petroleum Corp.,* 136 S.W.3d 227, 232 (Tex. 2004)); *id.* at 817-18 (citing *Burrow v. Acre,* 997 S.W.2d 229, 235 (Tex. 1999)).

Expert testimony is conclusory and *ipse dixit* in nature where there is no factual basis offered to support that opinion. *See, Jelinek,* 328 S.W.3d at 539-40; *Earle,* 998

S.W.2d at 890. Expert testimony is also conclusory and *ipse dixit* in nature when the stated basis of the opinion does not support the opinion. *See, Pollock,* 284 S.W.3d at 817-18.

Further, an inference stacked on other inferences is not legally sufficient evidence. *Marathon Corp.,* 106 S.W.3d at 728. Dr. Wayne's standard of care and breach testimony is legally insufficient evidence because it is conclusory and *ipse dixit* in nature. Dr. Wayne's testimony on these issues is also legally insufficient evidence because it involves one inference stacked on other inferences.

### 2. Dr. Wayne's testimony on the applicable standard of care and breach is legally insuficient:

### a. Failure to train on restraints:

The only evidence Appellee produced at trial that established a possible applicable standard of care and breach of that standard by ETMC is Appellee's assertion that ETMC simply did not ever train the EMS Providers on the use of restraint. (*See,* 3 RR 36, lines 6-8)("…my feeling where the failure of the standard of care occurred is that if the EMS providers only knew to talk down, they had not been taught.").

Dr. Wayne's opinion that the EMS Providers only knew talk-down and were not taught about the use of restraints was based only on two things. This opinion was based on (1) the fact the EMS Providers' did not restrain Ms. Delaune and (2) because these ladies did not mention restraint in their depositions (3 RR 60, lines 13-18; 3 RR 74, lines 14-20). This testimony is legally insufficient evidence of the applicable standard of care and breach of that standard by ETMC.

### (1) Evidence contrary to the verdict can be considered:

This Court can and should consider evidence contrary to the verdict when evaluating ETMC's claim that Dr. Wayne's testimony is legally insufficient evidence of the applicable standard of care and breach by ETMC. First, ETMC asserts that Dr. Wayne's testimony is incompetent because it is conclusory and *ipse dixit* in nature. In evaluation of a claim that evidence is incompetent, evidence showing such incompetence can be considered, even if contrary to the verdict. *See, City of Keller,* 168 S.W.3d at 812. Also applicable to evaluation of Dr. Wayne's testimony is the fact that when an expert's opinion is based on a certain assumption about the facts, appellate courts cannot disregard evidence showing those factual assumptions were unfounded. *Id.* at 813.

In addition, Dr. Wayne makes inferences based on certain circumstantial evidence. When the underlying circumstances are equally consistent with two facts, all of the evidence and known circumstances can be considered. *See, id.* at 813-14. In addition, Dr. Wayne makes conclusions about what the EMS Providers knew and did not know. In evaluating Dr. Wayne's conclusions about the EMS Providers' conscious knowledge and appreciation, evidence contrary to the verdict can be considered. *See, id.* at 817.

Finally, the evidence conclusively establishes that ETMC did train the EMS Providers on the use of restraint. Appellate courts should consider and do not disregard evidence that conclusively establishes the opposite of such a vital fact. *See, id.* at 814.

### (2) Testimony is conclusory and *ipse dixit*:

Dr. Wayne's testimony is conclusory and *ipse dixit* in nature because (1) his opinion is not supported by what he relies on as the basis of his testimony, (2) the factual assumptions he made are unfounded, and (3) he does not provide any factual basis for his opinion. First, with respect to the EMS Providers' actions, Dr. Wayne agreed that the decision to utilize restraints involves the exercise of judgment by the EMS provider (3 RR 75, lines 3-9). Dr. Wayne also agreed that even though the Behavioral Policy covered restraint use in patients with behavioral emergencies, this policy is only a "guideline" and not a "rule" (3 RR 73, lines 7-12). Dr. Wayne also agreed that application of this policy to the treatment of a particular patient also involves the exercise of judgment by the EMS provider (3 RR 73, lines 7-12).

Because an exercise of judgment is involved, one cannot simply infer from the fact Ms. Delaune was not restrained that the failure to restrain was because the EMS Providers were not trained on or did not know about restraint, as Dr. Wayne did here. The fact restraint was not used could have just as likely been because it was not felt that restraint was indicated. In fact, Ms. Moore testified that this was the reason Ms. Delaune was not restrained (*See,* 3 RR 202-03).

The summary judgment in favor of the EMS Providers is also of significance. Prior to trial it was determined that as a matter of law the EMS Providers did not have a duty to restrain Ms. Delaune and did not breach any duty to restrain Ms. Delaune (CR 365-66; 2 CR 119-120). Based on this established matter of law, the fact that the EMS Providers did not restrain Ms. Delaune cannot and does not provide any support for

Dr. Wayne's opinion that ETMC failed to train the EMS Providers on restraint. As such, this opinion is conclusory and incompetent. *See, Pollock,* 284 S.W.3d at 817-18. In fact, this ruling by the trial court conclusively prevents Dr. Wayne from inferring a failure to train was the reason the EMS Providers did not restrain Ms. Delaune.

Second, Dr. Wayne claims the EMS Providers' deposition testimony shows ETMC failed to train them on the use of restraint. Dr. Wayne infers this from his recollection the EMS Providers did not mention restraint in their depositions (3 RR 29, lines 12-16). Dr. Wayne's testimony here is wholly conclusory. *See, Jelinek*, 328 S.W.3d at 539-40; *Earle,* 998 S.W.2d at 890. At no time did Dr. Wayne quote or point a specific area in these depositions as evidence that confirms or supports his inference.

Also of significance is the fact that there is nothing in the record that shows the EMS Providers were ever asked a question during deposition that would have required them to discuss or mention the use of restraint. The record establishes that the answers a witness gives during deposition depends upon the questions asked (3 RR 57, lines 7-16; 3 RR 59, lines 1-14). The record also establishes that whether or not the EMS Providers discussed utilization of restraints in their deposition depended on Appellee's counsel asking one or more questions directed at the issue of restraints (5 RR 113, line 21 – 114, line 17).

Dr. Wayne's claim the EMS Providers' depositions show ETMC did not train them on restraints is conclusory and *ipse dixit* because there is no factual basis for this opinion. *See, Jelinek,* 328 S.W.3d at 539-40; *Earle,* 998 S.W.2d at 890. Specifically,

Dr. Wayne did not establish that based on the questions asked during their depositions the EMS Providers should have mentioned the use of restraint if they had knowledge about the use of restraint. To the contrary, Dr. Wayne simply assumed restraint was not mentioned because the EMS Providers did not know about it (3 RR 29, lines 12-16). Because this opinion is based on Dr. Wayne assumption that failure to mention restraint means ETMC did not train them on restraint and they did not have knowledge of restraint, this Court must consider and cannot disregard evidence that shows this assumption is unfounded. *See, City of Keller,* 168 S.W.3d at 813.

Under the circumstances, one also is equally able to infer restraint was not mentioned in the depositions because it was not asked about. Further, as will be shown immediately below, the evidence not only shows Dr. Wayne's "factual" assumption is unfounded, the evidence conclusively establishes ETMC did train the EMS Providers on restraint and that they had knowledge of restraint before starting work with ETMC.

**(3) Evidence conclusively establishes training on and knowledge of restraints:**

In testifying ETMC failed to train on the use of restraint, Dr. Wayne first stated the conclusion the EMS Providers "did not have the intrinsic knowledge" about the use of restraint (3 RR 9, lines 15-16). Later, Dr. Wayne refined this opinion to state that ETMC would have been negligent "if the EMS providers only knew to talk down" (3 RR 36, lines 6-9).

The evidence conclusively establishes not only that ETMC trained Ms. Moore and Ms. Spurgers on the use of restraint, but also that they had "intrinsic knowledge" about

**34**

the use of restraint long before they started work with ETMC. Because the evidence conclusively establishes ETMC trained on the use of restraint and the EMS Providers did not only know to talk down, the Court should consider, and cannot disregard, this evidence contrary to the verdict. *See, City of Keller,* 168 S.W.3d at 814.

The evidence shows the EMS Providers were aware of ETMC's Behavioral Policy and its provisions on the use of restraint (*See,* 3 RR 96, lines 2-5, 156; 4 RR 13, lines 16-19). The evidence also established the EMS Providers were trained on the use of restraint at ETMC (3 RR 156-57, 158-60, 166-67; 4 RR 28, 61-62; 20 RR 9, 15 [Def. Ex. 31]; 20 RR 19, 25 [Def. Ex. 32]; 20 RR 30 [Def. Ex. 37]; 20 RR 81-85 [Def. Ex. 38]). While Dr. Wayne testified that ETMC did not train on the use of restraint, this is conclusory testimony and is not validated by the evidence. In addition, the uncontroverted evidence also establishes the EMS Providers were trained on and had knowledge about the use of restraint prior to the time they started work for ETMC (*See,* 3 RR 135-36, 141, 145, 150; 4 RR 41, lines 19-25; 44, line 18 – 45, line 1). This evidence not only shows Dr. Wayne's opinion ETMC failed to train is incompetent because it has no factual basis, it conclusively establishes that ETMC trained the EMS Providers on the use of restraint and that the EMS Providers knew about the use of restraint. Appellee never controverted this evidence.

### (4)    Opinion involves improper inference stacking:

Dr. Wayne's testimony on this issue is also legally insufficient because it involves one inference stacked on other inferences. Specifically, Dr. Wayne inferred the EMS Providers were not trained on and did not know about restraint because (1) Ms. Delaune

was not restrained on the occasion in question and (2) the use of restraint was not mentioned in their depositions.

Dr. Wayne then infers (1) the EMS Providers did not restrain Ms. Delaune because they did not know about restraint, and (2) they did not mention restraint when they were deposed for the same reason (*See,* 3 RR 35, 36, 60). Dr. Wayne's inferences are not based on any facts about what training ETMC did provide or what training ETMC should have provided but did not provide. Thus, Dr. Wayne's "opinion" ETMC failed to train the EMS providers is legally insufficient because it is the result of improper inference-stacking. *See, Marathon Corp.,* 106 S.W.3d at 728.

### b. ETMC's training program:

To the extent that Appellee tries to argue the adequacy, degree, or sufficiency of the restraint training provided by ETMC was improper, ETMC would point out that there is nothing in the record that provides any evidence of the standard of care applicable to ETMC on this issue or a breach of a standard of care on this issue. Dr. Wayne never made any statement that the ETMC's restraint training was not adequate for any specific reason, that it did not cover the proper topics, or that the frequency or substance of the training ETMC provided on restraint was inadequate.

Absent from the record on this issue is any factual evidence showing that as a reasonably prudent employer ETMC was required to go beyond what it did do in training the EMS Providers on the use of restraint. Because this information is absent from the record, there is no evidence to support the applicable standard of care or a breach of any such standard by ETMC on this issue. *See, Dangerfield,* 264 S.W.3d at 912, 913;

**36**

*Patino,* 158 S.W.3d at 661; *Allsup's Convenience Stores, Inc.,* 934 S.W.2d at 437. Further, to the extent that Appellee tries to argue Dr. Wayne's testimony somehow implicates such a standard of care and breach, ETMC submits that any such testimony is legally insufficient evidence because it is conclusory and *ipse dixit* in nature. Specifically, Dr. Wayne never provides the necessary facts showing what additional action or steps a reasonable employer should take or that ETMC failed to take any such specific action or additional steps. *See, id; See also, Jelinek,* 328 S.W.3d at 539-40; *Earle,* 998 S.W.2d at 890; *Shaw,* 10 S.W.3d at 14; *Chopra,* 892 S.W.2d at 233.

In fact, Dr. Wayne agreed that the structure of ETMC's training program tracked what the national organization that certifies EMS providers requires for certification (3 RR 11-14). This further establishes Appellee does not have legally sufficient evidence of any applicable standard of care related to the nature and substance of ETMC's training on restraint or any breach of that standard.

### c.      Making sure what was taught is understood:

What Appellee is left to argue is that ETMC failed to make sure the EMS Providers understood what they were taught on restraint (*See,* 3 RR 36, lines 1-3; 3 RR 62, lines 6-9). This may be the true focus of Dr. Wayne's testimony (*See,* 3 RR 36 ["Fact two is assessing that those people have understood..."]; 3 RR 62 ["Again, what you're taught and what you know may not be the same thing. And there's a responsibility to assure that what you're taught is what you know"]).

Appellee, however, produced no evidence as to the standard of care applicable to a provider like ETMC to make sure that its employees understood what they were taught.

Whenever Dr. Wayne mentioned this concept, he never provided any details about how a provider goes about making sure its employees understand what they are taught. More importantly, Dr. Wayne never stated what ETMC should have done but failed to do to make sure the EMS Providers understood what they were taught on the use of restraint.

For these reasons, Appellee did not carry his burden to establish the applicable standard of care and breach on this issue. *See, Dangerfield,* 264 S.W.3d at 912, 913; *Patino,* 158 S.W.3d at 661; *Allsup's Convenience Stores, Inc.,* 934 S.W.2d at 437. For these same reasons, any testimony Dr. Wayne offered on this issue is legally insufficient because it is conclusory and *ipse dixit* in nature. *See, Jelinek,* 328 S.W.3d at 539-40; *Earle,* 998 S.W.2d at 890; *Shaw,* 100 S.W.3d at 14; *Chopra,* 892 S.W.2d at 233.

The fact Appellee produced no evidence of the standard of care or breach here is emphasized by Dr. Wayne's admission that he did not even know what ETMC's processes were to check compliance and make sure its EMS providers understood what they were taught (3 RR 83, lines 5-8). Thus, not only was there no evidence of the applicable standard of care on this issue, there was not even a basis from which Appellee or Dr. Wayne could claim ETMC violated any applicable standard of care related to this issue.

Finally, the evidence conclusively establishes that ETMC did act to make sure that its providers understood what they were taught. Dr. Wayne did not dispute that ETMC tested its providers on its protocols every year (3 RR 82, lines 15-19). Dr. Wayne also did not controvert that the EMS Providers' competency on restraint was demonstrated by passing tests every two and four years to maintain their Texas and national certifications

(*See,* 3 RR 133, lines 5-15; 3 RR 134, lines 22-25). ETMC also documented through routine evaluations that the EMS Providers knew and followed its protocols (*See,* 13 RR 56, 61, 66, 71, 82 [Pl. Ex. 19]; 14 RR 40, 43, 48, 54, 59 [Pl. Ex. 20]). For all these reasons, Appellee does not have legally sufficient evidence of the standard of care or breach on this issue.

### D.     Supportive Case Law:

The following cases support ETMC's position Appellee has legally insufficient evidence of the applicable standard of care or a breach of the standard of care by ETMC:

### 1.     *Mackey v. U.P. Enterprises, Inc.*:

This Court's opinion in *Mackey v. U.P. Enterprises, Inc.*, 935 S.W.2d 446 (Tex. App.—Tyler 1996, no pet.) supports ETMC's claim that there is legally insufficient evidence ETMC failed to train the EMS Providers on the use of restraint.

In *Mackey*, plaintiff alleged that she was sexually harassed by two of her employer's mangers, Smith and Johnson. *Id.* at 449. Plaintiff alleged her employer was liable for "negligent supervision, training, and evaluation of Smith and Johnson." *Id.* at 451, 459.

The employer, UPE, moved for summary judgment asserting that the summary judgment evidence conclusively showed there was no failure to train Smith and Johnson. *Id.* at 459-60. The summary judgment evidence showed UPE had a written policy against sexual harassment posted in all of its stores, required all new employees to read the policy, and stressed to employees that sexual harassment was against company policy. *Id.*

In contrast, plaintiff relied on her allegations that sexual harassment had occurred to establish a failure to supervise, train and evaluate. Plaintiff did not present evidence controverting the employer's facts or specifying other acts or omissions by the employer showing it failed to properly train its employees on sexual harassment. *Id.* at 460. Because plaintiff failed to produce such evidence, she failed to create a genuine issue of material fact to support her failure to train claim. *Id.*

The situation before the Court here is analogous to the situation before the Court in *Mackey*. The evidence here establishes that long before the EMS Providers started work with ETMC they were educated, trained on and knew about the use of restraint (*See,* 3 RR 129, 145-46, 140; 4 RR 44, line 22 – 45, line 1; 4 RR 52, lines 7-15). ETMC also has a written policy on the use of restraint that Appellee and his expert agree is a reasonable and proper policy (*See*, 3 RR 28, lines 10-25; 3 RR 90, lines 8-17). Both the EMS Providers knew about this Behavioral Policy (*See,* 3 RR 156; 4 RR 13). In addition, a copy of this policy was always in their ETMC ambulance (*See,* 3 RR 168, lines 20-24). Further, ETMC trained both the EMS Providers on restraint (13 RR 16 [Pl. Ex. 20]; 13 RR 26 [Pl. Ex. 16]; 20 RR 9, 15 [Def. Ex. 31]; 20 RR 19, 25 [Def. Ex. 32]). The EMS Providers' understanding and knowledge of the use of restraint was also routinely tested and both ladies passed this routine testing (*See,* 3 RR 134, lines 2-20; 3 RR 167, line 19 – 168, line 5). Finally, ETMC provided Power Point training on the use of restraint about four months before this incident (6 RR 97, line 20 – 98, line 13; 6 RR 105, lines 11-23; 6 RR 106, line 4 – 107, line 17; 20 RR 81-85 [Def. Ex. 38]).

In response to this evidence, like the plaintiff in *Mackey*, Appellee simply relies on the fact the EMS Providers did not restrain Ms. Delaune. Prior to trial, however, the trial court determined that the standard of care did not require that the EMS Providers restrain Ms. Delaune. Further, Appellee produced no evidence that controverted ETMC's training facts and provided no facts that showed ETMC somehow otherwise failed to train the EMS Providers on restraint. For these reasons, like in *Mackey*, Appellee has legally insufficient evidence to establish a failure to train by ETMC.

### 2. *Allsup's Convenience Stores, Inc. v. Warren:*

An employee who injured her back lifting boxes full of gallon milk jugs sued for negligent training in *Allsup's Convenience Stores. Allusp's,* 934 S.W.2d at 434. The employee prevailed at trial. The jury verdict and judgment in her favor was reversed on appeal.

The evidence at trial showed that the employee was familiar with the employer's safety manual and that this manual covered proper lifting techniques. A fellow employee also testified that he had shown the employee how to unload boxes. *Id.* at 437. The Amarillo Court of Appeals ruled that the employee's own testimony she was not trained to lift heavy boxes was not only conclusory, but it was not validated by the evidence. *Id.*

The Amarillo Court of Appeals also stated that the employee had the burden to "provide factual proof of the training that Allsup negligently failed to provided." *Id.* The court also stated:

> What is missing from the record to sustain [the employee's] claim is evidence of any training beyond that given [employee] for lifting

items from the truck which would be necessary and proper by a reasonably prudent employer.

*Id.* Because this evidence was not in the record, employee did not carry her burden, the judgment in her favor was reversed, and judgment was entered that she take nothing. *Id.* at 438-39.

ETMC's position here is supported by even more favorable circumstances than those in *Allsup's*. As in *Allsup's,* the evidence shows the EMS Providers were aware of the Behavioral Policy and its provisions on the use of restraint (*See,* 3 RR 96, lines 2-5, 156; 4 RR 13, lines 16-19). The evidence also established the EMS Providers were trained on the use of restraint at ETMC (3 RR 156-57, 158-60; 4 RR 28, lines 17-24; 39, lines 1-10; 61, line 12 – 62, line 1; 20 RR 9, 15 [Def. Ex. 31]; 20 RR 19, 25 [Def. Ex. 32]). While Dr. Wayne testified ETMC did not train on the use of restraint, this is conclusory testimony and is not validated by the evidence. Thus, the same circumstances that established legally insufficient evidence of a failure to train in *Allsup's* are present here. In addition, however, the uncontroverted evidence establishes the EMS Providers were trained on and knew about the use of restraint before they started work for ETMC (*See,* 3 RR 135-36, 141, 145, 150; 4 RR 41, lines 19-25; 44, line 18 – 45, line 1).

As in *Allsup's,* absent from the record is evidence of any training beyond that ETMC provided on restraint that would be required of a reasonably prudent emergency medical services provider. For this reason, *Allsup's* supports ETMC's assertion that the verdict and judgment in favor of Appellee should be reversed and that a take nothing judgment should be entered in favor of ETMC.

**42**

### 3. *Patino v. Complete Tire, Inc.*:

In *Patino,* an employee hired to remove and repair flat truck tires was injured while removing a large flat tire from a tire rim. *Patino,* 158 S.W.3d at 658. Claimant alleged his employer did not properly train him because he had not received any formal training on changing tires. The evidence showed that for the first few days of employment, claimant was accompanied by a more experienced tire technician who observed his tire-changing technique. This more experienced technician would have shown examples of proper technique to claimant and commented on any adjustments in technique that claimant needed to make. *Id.* at 661.

Claimant did not present any evidence showing what training beyond that he was given should be provided by a reasonable and prudent employer. *Id.* Because this evidence was missing, the Dallas Court of Appeals concluded claimant presented no evidence of a breach of any standard of care. *Id.*

Here, Appellee presented no evidence about training on restraint beyond that provided by ETMC that should be provided by a reasonable and prudent EMS provider. Appellee simply claimed in conclusory fashion that proper training was not provided. For this reason, *Patino* also supports ETMC's request for a reversal of the verdict and judgment against it.

## CONCLUSION

ETMC is entitled to reversal of the Final Judgment against it and in favor of Appellee because ETMC has shown there is legally insufficient evidence as to causation against ETMC and a failure to train by ETMC. Appellee's evidence is legally insufficient if one or more of the following circumstances exist:

1.      The record discloses a complete absence of a vital fact;

2.      The court is barred by rules of law or rules of evidence from giving weight to the only evidence offered to prove a vital fact;

3.      The evidence offered to prove a vital fact is no more than a mere scintilla, or;

4.      The evidence establishes conclusively the opposite of a vital fact.

*City of Keller,* 168 S.W.3d at 810; *Crown Pine Timber 1, L.P.,* 2012 Tex. App. LEXIS 3658 at *8-9.

There is legally insufficient evidence of causation because Appellee did not establish the EMS Providers committed an actionable tort. Not only is there a complete absence of this vital fact, the record establishes conclusively the opposite. The record establishes that as a matter of law the EMS Providers did not commit a tort against Appellee. This is a vital fact that Appellee had to prove in order to establish causation in his failure to train claim. Because this vital fact was not established, and could not be established as a matter of law, Appellee has legally insufficient evidence of causation on his failure to train claim and ETMC is entitled to reversal of the judgment against it.

There is also legally insufficient evidence of the standard of care applicable to ETMC and a breach of any standard of care. Other than making a conclusory and *ipse*

*dixit* assertion that ETMC simply did not train the EMS Providers on the use of restraint, Appellee presented no legally sufficient evidence of the standard of care applicable to ETMC in training providers like Ms. Moore and Ms. Spurgers on the use of restraint or a breach of that standard.

Appellee never provided any specific information about what was required of a reasonable employer in training EMS personnel on the use of restraint or that ETMC failed to provide some specific training that a reasonable employer would have provided. Appellee essentially did nothing more than claim Ms. Delaune should have been restrained and then assert she was not restrained because of a failure to train by ETMC. As shown by the authority cited above, the testimony Appellee offered is not competent evidence of the applicable standard of care or breach.

Because the actual facts did not support Appellee, the only way Appellee could argue there was a failure to train was by stacking inference upon inference. Not only is inference-stacking insufficient to create legally sufficient evidence, the inferences made are not supported by the facts.

The fact of the matter is the evidence conclusively established ETMC did train the EMS Providers on the use of restraint and that the EMS Providers were evaluated and tested on their knowledge of restraint at ETMC. Appellee never controverted those facts. Appellee only asserted in response that training and knowledge are two different things. Appellee, however, never provided any facts or evidence showing what a reasonable emergency medical services provider was required to do beyond what ETMC did.

Because Appellee did not provide these facts or evidence, his evidence on the applicable standard of care and breach is legally insufficient.

Because Appellee's evidence is legally insufficient on causation, the applicable standard of care and breach of the standard of care, the Tyler Court of Appeals should reverse the verdict and Final Judgment in favor of Appellee and enter a take nothing judgment against Appellee and in favor of ETMC.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services, respectfully requests that the Twelfth Court of Appeals grant it the following relief:

1.  Reverse the verdict and Final Judgment against it in the trial court, and;

2.  Enter a take nothing judgment against Appellee and in favor of East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services.

Respectfully Submitted,

**THIEBAUD REMINGTON THORNTON BAILEY, L.L.P.**

By: /s/Russell G. Thornton
**RUSSELL G. THORNTON**
State Bar Card No. 19982850
rthornton@trtblaw.com

4849 Greenville Avenue, Suite 1150
Dallas, Texas  75206
(214) 954-2200
(214) 754-0999 (Fax)

**COUNSEL FOR APPELLANT**
**EAST TEXAS MEDICAL CENTER d/b/a**
**EAST TEXAS MEDICAL CENTER**
**EMERGENCY MEDICAL SERVICES**

## CERTIFICATE OF COMPLIANCE

Pursuant to TEXAS RULES OF APPELLATE PROCEDURE 9.4(i)(3) Appellant certifies

that its Brief on the Merits, filed on June 3, 2015 in the Twelfth Court of Appeals,

contains **11,211** words.

/s/ Russell G. Thornton
**RUSSELL G. THORNTON**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the **3rd** day of **June, 2015**, a true and correct copy of the foregoing document was delivered to counsel listed below:

Mr. Ryan Krebs, M.D., J.D.                                          **VIA E-SERVE & E-MAIL**
THE LAW OFFICE OF RYAN KREBS
805 W. 10th Street, Suite 300
Austin, Texas  78701
ryan@ryankrebsmdjd.com

/s/Russell G. Thornton
**RUSSELL G. THORNTON**

# APPENDIX

# APPENDIX – "A"

FILED
LOIS ROGERS
DISTRICT CLERK

2014 DEC 23 PM 2: 49

SMITH COUNTY, TEXAS
BY
DEPUTY

Cause No. 13-0984-A

JODY DELAUNE, Individually; and §
as Personal Representative of the Estate §
of CRYSTAL DELAUNE, Deceased; §
and as Next Friend of DALTON §
DELAUNE, DESTINY DELAUNE, §
and DEE ANN DELAUNE, Minors, §
§
    Plaintiffs, §
§
v. §                   SMITH COUNTY, TEXAS
§
EAST TEXAS MEDICAL CENTER §
D/B/A EAST TEXAS MEDICAL CENTER §
EMERGENCY MEDICAL SERVICES, §
§
§
§
§
§
    Defendant. §                  7th JUDICIAL DISTRICT

In the DISTRICT COURT of

## FINAL JUDGMENT

The Court finds that the jury's verdict in this healthcare liability claim is supported by the evidence and therefore renders judgment against Defendant and for Plaintiffs as follows:

1.    The Court orders that Plaintiff, Jody Delaune, Individually recovers from Defendant, the sum

of:

> a.) $7,500.00 for pecuniary loss sustained in the past;
> b.) $36,000.00 for pecuniary loss in the future;

The Court orders that Plaintiff, Jody Delaune, as Next Friend of Dalton Delaune recovers

from Defendant, the sum of:

> c.) $7,500.00 for pecuniary loss sustained in the past;
> d.) $20,000.00 for pecuniary loss in the future;
> e.) $2,500.00 for loss of companionship and society in the past;
> f.) $2,500.00 for loss of companionship and society in the future;
> g.) $2,500.00 for mental anguish in the past;

h.) $2,500.00 for mental anguish in the future;

The Court orders that Plaintiff, Jody Delaune, as Next Friend of Destiny Delaune recovers

from Defendant, the sum of:

        i.)  $7,500.00 for pecuniary loss sustained in the past;
        j.)  $26,000.00 for pecuniary loss in the future;
        k.)  $2,500.00 for loss of companionship and society in the past;
        l.)  $2,500.00 for loss of companionship and society in the future;
        m.) $2,500.00 for mental anguish in the past;
        n.)  $2,500.00 for mental anguish in the future;

The Court orders that Plaintiff, Jody Delaune, as Next Friend of Dee Ann Delaune recovers

from Defendant, the sum of:

        o.)  $7,500.00 for pecuniary loss sustained in the past;
        p.)  $36,000.00 for pecuniary loss in the future;
        q.)  $2,500.00 for loss of companionship and society in the past;
        r.)  $2,500.00 for loss of companionship and society in the future;
        s.)  $2,500.00 for mental anguish in the past;
        t.)  $2,500.00 for mental anguish in the future;

The Court orders that Plaintiff, Jody Delaune, as Personal Representative of the Estate of

Crystal Delaune recovers from Defendant, the sum of:

        u.)  $3,000.00 for funeral and burial expenses.

The total judgment for a – u above is $181,000.00.

The judgment for "past damages" for items a, c, e, g, i, k, m. o, q and s is $45,000.00.

Plaintiff is entitled to recover prejudgment interest on the $45,000.00 in "past damages." The

prejudgment interest rate on these past damages is equivalent to the post judgment interest

rate of 5%. Tex. Fin. Code § 304.103 (Vernon Supp. 2002). Pursuant to Texas Finance Code

section 304.007, the Court hereby takes judicial notice of the fact that at the time of the

rendition of this judgment, the post judgment interest rate as set by the Consumer Credit

Commission and published in the Texas Register is 5 percent (5%). Pre-judgment interest in

a health care liability claim begins accruing on the earlier of the 180th day after the date

Defendant received written notice of the claim or the date suit is filed and ends on the date

before the judgment is signed. Defendant received written notice of the claim on November

8, 2012. See Exhibit B attached to Plaintiffs' First Amended Motion for Judgment on the Verdict. (Plaintiffs' Original Petition was filed April 15, 2013). 180 days from November 8, 2012 is May 7, 2013. May 7, 2013 to December 21, 2014, the day before signing of the judgment on December 22, 2014 is 594 days or 1.63 years (594/365 = 1.63). Using these calculations, the Court finds that prejudgment interest of 5% simple interest on the $45,000.00 in "past damages" accruing 1.63 years is $3,661.64 (.05 x 1.63 x 45,000 = 3,661.64).

2. The Court orders that Plaintiffs, Jody Delaune, Individually; and as Personal Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of Dalton Delaune, Destiny Delaune, and Dee Ann Delaune, Minors, recover from Defendant taxable court costs in the amount of $7,377.48 from Defendant. See Exhibit C attached to Plaintiffs' First Amended Motion for Judgment on the Verdict.

3. The Court orders that the total judgment for damages recoverable by Plaintiffs from Defendant as reflected in the Charge of the Court attached to Plaintiffs' First Amended Motion for Judgment on the Verdict as Exhibit A, taxable court costs attached to Plaintiffs' First Amended Motion for Judgment on the Verdict as Exhibit C, and pre-judgment interest on past damages is $192,039.12 (181,000 + 7,377.48 + 3,661.64 = 192,039.12).

4. Pursuant to Texas Finance Code section 304.005(a) (Vernon Supp. 2002), the Court orders that post judgment interest will begin to accrue on this judgment at the legal rate of 5% beginning on the date this judgment is signed and that Defendant is responsible and shall continue to be responsible to Plaintiffs for such post judgment interest until the judgment is satisfied in full.

5. The Court orders execution to issue for this judgment.

6. This judgment finally disposes of all claims and all parties and is appealable.

7.     The Court denies all relief not granted in this judgment.

SIGNED on this 23rd day of December, 2014.

Judge Kerry L. Russell

# APPENDIX – "B"

FILED
LOIS ROGERS
DISTRICT CLERK

2014 NOV 24 PM 1: 49

BY_____
          DEPUTY

| | | |
|---|---|---|
| JODY DELAUNE, Individually; and | § | IN THE 7TH DISTRICT |
| as Personal Representative of the Estate | § | SMITH COUNTY, TEXAS |
| of CRYSTAL DELAUNE, Deceased; | § | |
| and as Next Friend of DALTON | § | |
| DELAUNE, DESTINY DELAUNE, | § | |
| and DEE ANN DELAUNE, Minors, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | COURT IN AND FOR |
| | § | |
| EAST TEXAS MEDICAL CENTER | § | |
| d/b/a EAST TEXAS MEDICAL | § | |
| EMERGENCY MEDICAL SERVICES, | § | |
| | § | |
| Defendant. | § | SMITH COUNTY, TEXAS |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Here are the instructions for answering the questions.

1.      Do not let bias, prejudice, or sympathy play any part in your decision.

2.      Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.      You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.



4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. The answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

"Negligence" when used with respect to the conduct of East Texas Medical Center Emergency Medical Services, means failure to use ordinary care, that is, failing to do that which an emergency medical services provider of ordinary prudence would have done under the same or

similar circumstances or doing that which an emergency medical services provider of ordinary prudence would not have done under the same or similar circumstances. A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

"Ordinary care," when used with respect to the conduct of East Texas Medical Center Emergency Medical Services, means that degree of care that an emergency medical services provider of ordinary prudence would use under the same or similar circumstances. An emergency medical services provider acts in the manner in which it formulates, implements, and enforces its policies, procedures, rules, bylaws, and other governing protocols, whether express or implied.

"Proximate cause," when used with respect to the conduct of East Texas Medical Center Emergency Medical Services, means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an emergency medical services provider using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

QUESTION 1

Did the negligence, if any, of East Texas Medical Center Emergency Medical Services proximately cause the death of Crystal Delaune?

Answer "Yes" or "No":

Answer: _Yes_

Answer Question 2 if you answered "Yes" for Question 1. Otherwise, do not answer Question 2.

QUESTION 2

What sum of money, if paid now in cash, would fairly and reasonably compensate Jody Delaune for his damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1.    Pecuniary loss sustained in the past:

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Jody Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ __7,500.00__

2.    Pecuniary loss that, in reasonable probability, will be sustained in the future.

Answer: __36,000.00__

3.    Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Jody Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ __0.00__

4.    Loss of companionship and society that, in reasonable probability, will be sustained in the future.

Answer: $ __0.00__

5.      Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Jody Delaune because of the death of Crystal Delaune.

Answer: $_____ *0.00* _____

6.      Mental anguish that, in reasonability probability, will be sustained in the future.

Answer: $_____ *0.00* _____

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Jody Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 3 if you answered "Yes" for Question 1. Otherwise, do not answer Question 3.

QUESTION 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Dalton Delaune for his damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1.    Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Dalton Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 7,500.00

2.    Pecuniary loss that, in reasonable probability, Dalton Delaune will sustain in the future.

Answer: $ 20,000.00

3.    Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Dalton Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 2,500.00

4.    Loss of companionship and society that, in reasonable probability, Dalton Delaune will sustain in the future.

Answer: $ 2,500.00

5. Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Dalton Delaune because of the death of Crystal Delaune.

Answer: $ 2,500.00

6. Mental anguish that, in reasonability probability, Dalton Delaune will sustain in the future.

Answer: $ 2,500.00

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Dalton Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 4 if you answered "Yes" for Question 1. Otherwise, do not answer Question 4.

QUESTION 4

What sum of money, if paid now in cash, would fairly and reasonably compensate Destiny Delaune for her damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1. Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Destiny Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 7,500.00

2. Pecuniary loss that, in reasonable probability, Destiny Delaune will sustain in the future.

Answer: $ 26,000.00

3. Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Destiny Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 2,500.00

4. Loss of companionship and society that, in reasonable probability, Destiny Delaune will sustain in the future.

Answer: $ 2,500.00

5. Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Destiny Delaune because of the death of Crystal Delaune.

Answer: $ 2,500 . 00

6. Mental anguish that, in reasonability probability, Destiny Delaune will sustain in the future.

Answer: $ 2,500 . 00

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Destiny Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 5 if you answered "Yes" for Question 1. Otherwise, do not answer Question 5.

QUESTION 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Dee Ann Delaune for her damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1. Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Dee Ann Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 7,500.00

2. Pecuniary loss that, in reasonable probability, Dee Ann Delaune will sustain in the future.

Answer: $ 36,000.00

3. Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Dee Ann Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 2,500.00

4. Loss of companionship and society that, in reasonable probability, Dee Ann Delaune will sustain in the future.

Answer: $ 2,500.00

5.  Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Dee Ann Delaune because of the death of Crystal Delaune.

Answer: $ 2,500.00

6.  Mental anguish that, in reasonability probability, Dee Ann Delaune will sustain in the future.

Answer: $ 2,500.00

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Dee Ann Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 6 if you answered "Yes" for Question 1. Otherwise, do not answer Question 6.

QUESTION 6

What sum of money would have fairly and reasonably compensated Crystal Delaune for—

1.  Pain and mental anguish.

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Crystal Delaune before her death as a result of the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: $___0___.__00__

2.  Funeral and burial expenses.

"Funeral and burial expenses" means the reasonable amount of expenses for funeral and burial for Crystal Delaune reasonably suitable to her station in life.

Answer in dollars and cents for damages, if any.

Answer: $___3,000___.__00__

## PRESIDING JUROR

1.      When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.      The presiding juror has these duties:

   a.      have the complete charge read aloud if it will be helpful to your deliberations;

   b.      preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

   c.      give written questions or comments to the bailiff who will give them to the judge;

   d.      write down the answers you agree on;

   e.      get the signatures for the verdict certificate; and

   f.      notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## INSTRUCTIONS FOR SIGNING THE VERDICT CERTIFICATE

1.      You may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another.

2.      If ten jurors agree on every answer, those ten jurors sign the verdict.

If eleven jurors agree on every answer, those eleven jurors sign the verdict.

If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.      All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those then who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

SIGNED this 24th day of November, 2014.

_____
HONORABLE KERRY L. RUSSELL
JUDGE PRESIDING, 7TH DISTRICT COURT

# VERDICT CERTIFICATE

*Check one:*

Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____        _____
Signature of Presiding Juror                    Printed Name of Presiding Juror

Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

FILED
LOIS ROGERS
DISTRICT CLERK
2014 NOV 24 PM 8:56
SMITH COUNTY, TEXAS
BY _____ DEPUTY

Signature                                        Name Printed

| | Signature | Name Printed |
|---|---|---|
| 1. | Marsha Warren | MARSHA WARREN |
| 2. | Ruth Feeney | Ruth Feeney |
| 3. | Andrea B. Wilson | Andrea B. Wilson |
| 4. | Stacy Martin | STACYy MARTIN |
| 5. | Margie Boone | Margie Boone |
| 6. | | Benjamin C. Terry |
| 7. | Kirk Oldham | Kirk OLDHAM |
| 8. | | Chris Harman |
| 9. | Luke Porter | Luke Porter |
| 10. | | Luke Stanly |
| 11. | WL Smotherman | WL Smotherman |

# APPENDIX – "C"

JODY DELAUNE, Individually; and
as Personal Representative of the Estate
of CRYSTAL DELAUNE, Deceased;
and as Next Friend of DALTON
DELAUNE, DESTINY DELAUNE,
and DEE ANN DELAUNE, Minors,

      Plaintiffs,

v.

EAST TEXAS MEDICAL CENTER
EMS, LINDA MOORE, and
LINDY SPURGERS,

      Defendants.

In the DISTRICT COURT of TEXAS

BY _____
                DEPUTY

SMITH COUNTY, TEXAS

7th JUDICIAL DISTRICT

## Order on ~~Defendants' Reply~~ ~~Plaintiffs' Response to~~ Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful or Wanton Negligence

Defendants East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services, Linda Moore, and Lindy Spurgers (together, "Defendants") presented their Reply to Plaintiffs' Response to Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful or Wanton Negligence in addition to their Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful and Wanton Negligence. The Court, having reviewed the motions, Plaintiffs' response to the motions, the applicable law, and the argument of counsel, if any, is of the opinion Defendants' motions should be granted.

It is, therefore, ORDERED, ADJUDGED, and DECREED that ~~Defendants' Reply to Plaintiffs' Response to~~ Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful or Wanton Negligence and Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful and Wanton Negligence are GRANTED, and all claims brought by Plaintiffs against Linda Moore and Lindy Spurgers are dismissed with prejudice.

All relief not expressly granted herein is denied.

SIGNED this 28th day of July 2014

_____
Judge Presiding

Order on Defendants' Reply
to Plaintiffs' Response to Defendants' Traditional and No-Evidence Motions for
Summary Judgment Regarding Wilful or Wanton Negligence – Page 2

Page 366

# APPENDIX – "D"


**LexisNexis®**

MICHAEL B. WANSEY, INDIVIDUALLY AND D/B/A RIO GRANDE DEFENSIVE DRIVING SCHOOL, PETITIONER, v. CHERYL D. HOLE, RESPONDENT

NO. 11-0348

SUPREME COURT OF TEXAS

*379 S.W.3d 246; 2012 Tex. LEXIS 559; 55 Tex. Sup. J. 1093*

June 29, 2012, Opinion Delivered

**SUBSEQUENT HISTORY:** Released for Publication August 17, 2012.
Motion for rehearing on petition for review denied by *Wansey v. Hole, 2012 Tex. LEXIS 648 (Tex., Aug. 17, 2012)*

**PRIOR HISTORY:** [**1]
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.
*Wansey v. Hole, 2011 Tex. App. LEXIS 2594 (Tex. App. Corpus Christi, Apr. 7, 2011)*

**COUNSEL:** For Wansey, Michael B., PETITIONER: Mr. William L. Hubbard, Attorney at Law, Edinburg TX; Mr. Steve Efthimiou, Attorney at Law, Brownsville TX; Mr. Thomas G. Rayfield, Law Offices of Thomas Rayfield, McAllen TX; Mr. Jason Roger Mann, Jason R Mann & Associates, HARLINGEN TX.

For Hole, Cheryl D., RESPONDENT: Ms. Ida Cecilia Garza, Gault Nye & Quintana LLP, McAllen TX; Mr. Ronald G. Hole, Hole & Alvarez, L.L.P., McAllen TX.

**OPINION**

[*246] **PER CURIAM**

In this case, we must decide whether a plaintiff may recover on a claim for negligent hiring and supervision despite suffering [*247] no harm at the hands of the employee who was allegedly negligently hired. We hold that a negligent hiring claim requires that some harmful or negligent conduct of an employee--one hired pursuant to the defendant's negligent hiring or supervision practices--proximately caused the injury complained of. Accordingly, pursuant to *Texas Rule of Appellate Procedure 59.1*, without hearing oral argument we reverse the court of appeals' judgment and render judgment for petitioner.

Cheryl and Ronald Hole, both attorneys, enrolled their minor daughter in a driving [**2] school owned and operated by Michael B. Wansey. One evening, when Ronald arrived at the business to pick up his daughter, he was unable to find her inside. He proceeded to a door that stood ajar at the back of the building. Opening the door, Ronald found her standing outside, in the dark, backing away from one of her driving instructors. Ronald suspected that they had engaged in inappropriate behavior, but both his daughter and the instructor denied any wrongdoing.

Thereafter, the Holes removed their daughter from the course and demanded a full refund from Wansey, since she would have to start a new course from the beginning. Wansey refused to offer any explanation for the instructor's behavior, and disclaimed any responsibility for his employee's behavior after class hours. Wansey also refused to issue a full refund, but instead sent a check for only eighteen dollars--the pro-rated cost of the four hours of instruction remaining in the course.

Cheryl Hole--the lone plaintiff in this case--sued Wansey, not for harm endured by her daughter in the allegedly inappropriate incident with the driving instructor, but for the cost of the driving course, alleging breach of contract and grossly negligent [**3] or malicious hiring, training, supervision, or retention. The jury returned a verdict in favor of Hole, finding that Wansey's negligent conduct had proximately caused harm to Hole and that Wansey had breached the contract. The jury awarded Hole $225 (the cost of the course) in compensatory damages, $5,000 in attorney fees, and $15,000 in

exemplary damages. The court of appeals reversed the breach of contract claim and the award of attorney fees, but affirmed the negligent hiring judgment and the compensatory and punitive damages. _____ S.W.3d _____. The court of appeals reasoned that Hole sustained harm in the form of the un-refunded cost of the driving course, and that Wansey's negligent hiring practices proximately caused those damages. We disagree.

Though we have never expressly set out what duty an employer has in hiring employees, or said that a negligent hiring claim requires more than just negligent hiring practices, there is a broad consensus among Texas courts that such a claim requires that the plaintiff suffer some damages from the foreseeable misconduct of an employee hired pursuant to the defendant's negligent practices. *See Brown v. Swett & Crawford of Tex., Inc., 178 S.W.3d 373, 384 (Tex. App.--Houston [1st Dist.] 2005, no pet.)* [**4] ("To prevail on a claim for negligent hiring or supervision, the plaintiff is required to establish not only that the employer was negligent in hiring or supervising the employee, but also that the employee committed an actionable tort against the plaintiff."); *Gonzales v. Willis, 995 S.W.2d 729, 739 (Tex. App.--San Antonio 1999, no pet.) overruled in part on other grounds by Hoffmann-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 447-48 (Tex. 2004); Mackey v. U.P. Enters., Inc., 935 S.W.2d 446, 459 (Tex. App.--Tyler 1996, no writ).* We have explicitly established this requirement in negligent [*248] entrustment cases, which are factually similar to negligent hiring claims. *Schneider v. Esperanza Transmission Co., 744 S.W.2d 595, 596 (Tex. 1987)* ("[T]here must be a showing . . . that the [employee] driver's negligence proximately caused the accident."); *see also TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 240 (Tex. 2010)* (concluding that negligent hiring should have a similar requirement to negligent entrustment cases, which requires that the employee's negligent conduct harm the plaintiff).

In this case, Hole did not present legally sufficient evidence of any harm caused by an employee of Wansey's [**5] driving school. Even had Cheryl Hole sued on behalf of her daughter, she presented no evidence that the driving instructor actually engaged in inappropriate behavior--indeed, Ronald Hole conceded in his trial testimony that he does not know that anything illegal happened, but rather just thought the situation was inappropriate. Hole also presented no evidence that proper hiring and supervision policies would have prevented the incident, or that her daughter suffered any harm. Rather, the only harm presented in this case was the purely economic harm--caused to Cheryl as an indirect result of the alleged incident--of the loss of the driving course tuition. Besides being an indirect, attenuated harm, the loss of the tuition was harm to the subject matter of the contract between the Holes and Wansey, which is not recoverable in tort.[1] *See Sw. Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991); Sterling Chems., Inc. v. Texaco Inc., 259 S.W.3d 793, 796 (Tex. App.--Houston [1st Dist.] 2007, pet. denied)* ("Simply stated, under the economic loss rule, a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim.").

1  The court [**6] of appeals found the evidence legally insufficient to support the jury's breach of contract finding, and Hole did not appeal that finding to this Court.

A negligence finding requires a duty, breach, and damages proximately caused by that breach. *Doe v. Boys Clubs., 907 S.W.2d 472, 477 (Tex. 1995).* Because Hole presented no evidence of harm caused by an employee hired pursuant to Wansey's hiring policies, we hold she did not present legally sufficient evidence of damages proximately caused by Wansey's alleged negligence. We reverse the judgment of the court of appeals insofar as it affirmed the award of compensatory and exemplary damages for negligent hiring and supervision, and render judgment for Wansey. In all other respects the court of appeals' judgment is affirmed.

**OPINION DELIVERED:** June 29, 2012

# APPENDIX – "E"


LexisNexis®

WAL-MART STORES, INC. and Wayne Cruickshank, Appellants v. Ignacio AGUILERA-SANCHEZ, Individually and as Surviving Spouse/Heir of Irene Aguilera and as Next Friend of Marina Aguilera, a Minor, Veronica Aguilera and Ignacio Aguilera, Children and Statutory Heirs of Irene Aguilera, Appellees

No. 04-02-00458-CV

COURT OF APPEALS OF TEXAS, FOURTH DISTRICT, SAN ANTONIO

2003 Tex. App. LEXIS 4846

June 11, 2003, Delivered
June 11, 2003, Filed

**SUBSEQUENT HISTORY:** Released for Publication January 27, 2004.
Petition for review denied by *Aguilera-Sanchez v. Wal-Mart Stores, Inc., 2004 Tex. LEXIS 331 (Tex., Apr. 9, 2004)*
Motion for rehearing on petition for review denied by *Aguilera-Sanchez v. Wal-Mart Stores, Inc., 2004 Tex. LEXIS 1373 (Tex., July 16, 2004)*

**PRIOR HISTORY:** [*1] From the 229th Judicial District Court, Starr County, Texas. Trial Court No. DC-95-61. Honorable Alex W. Gabert, Judge Presiding.

**DISPOSITION:** REVERSED AND RENDERED.

**COUNSEL:** FOR APPELLANTS: Chad M. Forbes, Lucy Haroutunian, Thomas C. Wright, The Wright Law Firm, Houston, TX. Russell H. McMains, Law Offices Of Russell H. McMains, corpus Christi, TX.

FOR APPELLEES: Thomas H. Crofts, Jr., Christopher A. Lotz, Crofts & Callaway, P.C., San Antonio, TX, James P. Sharp, Jr., Sharp Law Firm, Houston, TX.

**JUDGES:** Opinion by: Karen Angelini, Justice. Dissenting opinion by: Alma L. Lopez, Chief Justice. Sitting: Alma L. Lopez, Chief Justice, Karen Angelini, Justice, Phylis J. Speedlin, Justice.

**OPINION BY:** Karen Angelini

**OPINION**

Appellants Wal-Mart Stores, Inc. ("Wal-Mart") and Wayne Cruickshank appeal the trial court's judgment arguing that there is insufficient evidence to support the jury's findings, that the trial court erroneously denied their motion to transfer venue, and that the judgment improperly awards a double recovery. Because we find that the evidence is legally insufficient to support the jury's findings of malicious prosecution, intentional infliction of emotional distress, and negligent hiring, we reverse and render judgment in favor of Wal-Mart and Cruickshank.

**BACKGROUND**

Cruickshank, a loss prevention investigator for Wal-Mart had received an internal Wal-Mart report describing the infamous "Mickey Mouse" gang. This gang had been shoplifting from Wal-Mart and other retailers. According to the report, the modus operandi [*2] of the gang was to use juveniles to steal the merchandise while the adults acted as look-outs. The juveniles would line the shopping baskets with cardboard paper, place merchandise in the basket, and then place clothing on top of the basket to hide the merchandise. The juveniles would then walk out with the merchandise. If the juveniles were apprehended leaving the store, the adults could flee the scene and avoid prosecution. Meanwhile, the juveniles would eventually be released from police custody without facing prosecution.

On the afternoon of June 15, 1994, Cruickshank observed two Hispanic juvenile males in the stationary department take colored poster paper from the shelf and line two shopping carts with the paper. Cruickshank then

saw the juveniles push the shopping carts into the electronics department where they were directed by adults to place merchandise into the shopping carts. As the juveniles attempted to leave the electronics department with the merchandise, Cruickshank intercepted the juveniles and detained them for questioning. While the juveniles were being detained, all of the adults, except a man and a woman whom Cruickshank suspected were the juveniles' parents, [*3] left the store. Cruickshank interrogated the juveniles in a back room in front of these "suspected" parents; however, the "suspected" parents and the juveniles all denied knowing one another. Cruickshank then called the Round Rock Police Department. Sergeant Jack Abbott was dispatched to the store. When Abbott arrived, the "suspected" parents left the store. The man left in a black Chevrolet Blazer while the women departed in an orange Chevrolet.

According to Cruickshank, there were five security cameras in the electronics department. Two cameras in the ceiling were not working. Two camcorders on the back aisle acted as security cameras and were placed at shoulder level. The final camera was in the ceiling and had a view of the cash register shooting down the front aisle of the electronics department. Although Cruickshank testified at trial that he had not reviewed the videotape from this final camera, he admitted that he would have been able to see the shoplifters had he watched it. Cruickshank testified that he gave Abbott the only videotape showing the incident and that he did not make a copy. However, at trial, Abbott could not remember receiving a videotape. Moreover, although [*4] Wal-Mart policy requires employees to document the distribution of such a videotape to the police department in an evidence log, Cruickshank failed to log the distribution of this videotape to the Round Rock Police Department.

At 6:00 p.m. on the evening of the incident, Cruickshank prepared a voluntary statement for the police in which he affirms that he observed two Hispanic juvenile males remove merchandise from the shelves; he also affirms that he saw a Hispanic female aid the juvenile males. Two days after the juveniles were taken into custody, Abbott met with Detective Hamby, an officer with the Houston Police Department, John Smith, a Wal-Mart employee with their Investigative Task Force, and Steve Vina, another loss-prevention employee with Target. Detective Hamby, who had been investigating this "Mickey Mouse" gang, had a list of suspects, along with their driver's license numbers and/or Texas Identification Card Numbers. Using Hamby's list of suspects, Abbott called the Texas Department of Public Transportation and requested copies of the photographs on the driver's licenses and identification cards for these suspects. Abbott then retrieved the photographs from the Austin [*5] office of the DPS.

Cruickshank received a call at home from the Round Rock Police Department asking that he come in for a photo line-up. Using the photos from DPS, Officer Robert Shumaker presented Cruickshank with a photo line-up. From the line-up, Cruickshank identified Maria Cristina Flores, Judy Martinez, Annette Perez, Carmen Solis, Felipe Rios Hernandez, and Irene Perez Aguilera (the plaintiff in the underlying lawsuit). Cruickshank then prepared a second, much more detailed statement in which he names all of the adults who aided the juveniles.

On the day the juveniles were arrested, Judy Martinez, also identified as a suspect by Cruickshank, had gone to the Round Rock police station and attempted to claim the juveniles. Officer Abbott told her that she needed to come back with proof that the juveniles belonged to her. On the same day that Cruickshank made the photo identifications, Martinez was driving back from Houston with the necessary proof for one of the juveniles. The guardian of the other juvenile was Irene Aguilera's mother. Because Aguilera's mother was elderly and disabled, Aguilera accompanied her mother to Round Rock to pick up the juvenile. They both rode with [*6] Martinez. When the threesome arrived at the juvenile detention facility, Officer Abbott received a call informing him that they were there. Now armed with Cruickshank's identifications and written statements, Abbott acquired arrest warrants for Aguilera and Martinez. Aguilera and Martinez were arrested at the detention center. Aguilera was in jail for a month before her family could accumulate the money for her bail. According to Aguilera, she was physically assaulted during this time in jail. After she made bail, she was under house arrest. As a result of her arrest and detention, Aguilera developed post-traumatic stress disorder. The District Attorney's office later dismissed the charge of engaging in organized criminal activity against her. At trial, the mailman responsible for delivering the mail to Aguilera's home testified that Aguilera met him at the door of her Houston home on June 15, 1994 and could not have been in Round Rock committing shoplifting. Aguilera also testified that she was at home on the day in question. [1]

1 Because Aguilera died before trial, her deposition testimony was read into the record.

[*7] Aguilera filed suit against Wal-Mart and Cruickshank, alleging claims of malicious prosecution, intentional infliction of emotional distress, and negligent hiring. At trial, the jury found that Wal-Mart and Cruickshank maliciously prosecuted Aguilera and intentionally inflicted emotional distress upon her. The jury also found that Wal-Mart was negligent in its hiring of Cruickshank. Based upon the affirmative liability findings as to the malicious prosecution and intentional in-

fliction of emotional distress claims, the jury awarded actual damages in the amount of $ 6.5 million. Based upon its finding of negligent hiring, the jury awarded an additional $ 6.5 million in actual damages. The jury also assessed $ 3,700 in exemplary damages against Cruickshank and $ 1 in exemplary damages against Wal-Mart. The final judgment awards plaintiffs approximately $ 20 million. Wal-Mart and Cruickshank appeal.

## STANDARD OF REVIEW

In their first three issues, Wal-Mart and Cruickshank contend that there is legally and factually insufficient evidence to support the jury's findings on malicious prosecution, intentional infliction of emotional distress, and negligent hiring. In reviewing a "no [*8] evidence" issue, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento, 48 S.W.3d 749, 754, 44 Tex. Sup. Ct. J. 655 (Tex. 2001)*. If there is more than a scintilla of evidence to support the finding, the finding will be upheld. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc., 960 S.W.2d 41, 48, 41 Tex. Sup. Ct. J. 289 (Tex. 1998)*. In reviewing a factual sufficiency point, we are required to weigh all of the evidence in the record. *Tex. Dep't of Mental Health & Mental Retardation v. Rodriguez, 63 S.W.3d 475, 480 (Tex. App.--San Antonio 2001, pet. denied)*. Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

## MALICIOUS PROSECUTION

There are seven elements of a malicious prosecution claim in Texas: (1) the commencement of a criminal prosecution against the plaintiff; (2) initiation or procurement of the prosecution by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the lack of probable [*9] cause for the proceedings; (6) malice in filing the charge; and (7) damage suffered by the plaintiff. *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517, 40 Tex. Sup. Ct. J. 839 (Tex. 1997)*. According to Wal-Mart and Cruickshank, there is legally and factually insufficient evidence (1) that Cruickshank initiated or procured Aguilera's prosecution, (2) that the criminal case terminated in Aguilera's favor, (3) that Cruickshank lacked probable cause, and (4) that Cruickshank acted with malice. We hold that there is legally insufficient evidence that Cruickshank lacked probable cause.

In the context of malicious prosecution, probable cause is defined as the existence of those facts and circumstances that would excite a belief in a reasonable person, acting on the facts within his knowledge, that the person charged was guilty of a crime. *Akin v. Dahl, 661 S.W.2d 917, 921, 27 Tex. Sup. Ct. J. 23 (Tex. 1983)*. The probable cause inquiry asks whether a reasonable person would believe a crime had been committed, given the facts as the defendant honestly and reasonably believed them to be before the criminal proceedings were instituted. *Id.* The question is not what the actual facts were, but what the [*10] defendant honestly and reasonably believed the facts to be. *Closs v. Goose Creek Consol. ISD, 874 S.W.2d 859, 877 (Tex. App.--Texarkana 1994, no writ)*. When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact is charged with resolving conflicts in the evidence to determine if probable cause exists. *Richey, 952 S.W.2d at 518*. If the facts are uncontested, then the question of whether defendant acted based upon probable cause becomes a question of law to be decided by the court. *Id.*

Appellees argue that Cruickshank acted without probable cause because he unreasonably failed to review the Wal-Mart videotape that he admits would have shown the perpetrators of the crime. While it is true that Cruickshank could have reviewed the videotape to confirm the identity of the suspects, the proper inquiry is not whether Cruickshank was negligent in failing to view the videotape; the proper inquiry is whether a reasonable person would have believed that Aguilera had committed the offense of shoplifting. It is undisputed that Cruickshank witnessed individuals shoplifting and that after looking at the picture of Aguilera [*11] in the photo line-up, he thought that Aguilera was the woman he saw aiding the juveniles. These undisputed facts amount to probable cause.

Appellees also argue that there is evidence of probable cause because the jury could infer that Cruickshank withheld the videotape from the police. It is immaterial, however, to the probable cause inquiry that the defendant did not fully and fairly disclose all material information. In *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 519, 40 Tex. Sup. Ct. J. 839 (Tex. 1997)*, the Texas Supreme Court held that failing to fully and fairly disclose all material information and knowingly providing false information to the prosecutor are relevant to the malice and causation elements of a malicious prosecution claim but have no bearing on probable cause....The probable cause inquiry asks only whether the complainant reasonably believed that the elements of a crime had been committed based on the information available to the complainant before criminal proceedings began. When a complainant reasonably believes a crime has occurred, the reasonableness of that belief is not negated by the failure to fully disclose all relevant facts to the officer. Thus, the extent [*12] of the disclosure to the prosecutor is not probative of lack of probable cause, but rather indicates whether the complainant may have acted with

malice or may have, by knowingly providing false information, caused the prosecution.

There is, therefore, legally insufficient evidence to support the jury's finding of lack of probable cause. We sustain this issue.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Additionally, Wal-Mart and Cruickshank argue that there is no evidence to support the jury's finding on intentional infliction of emotional distress. The elements of a cause of action for intentional infliction of emotional distress are (1) that the defendant acted intentionally or recklessly, (2) that the defendant's conduct was extreme and outrageous, (3) that the defendant's conduct was directed at the plaintiff or at a third person in the plaintiff's presence, (4) that the defendant's conduct proximately caused the plaintiff emotional distress, and (5) that the emotional distress suffered by the plaintiff was severe. *Morgan v. Anthony, 27 S.W.3d 928, 929, 43 Tex. Sup. Ct. J. 1172 (Tex. 2000)* (per curiam).

According to Wal-Mart and Cruickshank, there is no evidence that [*13] Cruickshank's conduct was extreme and outrageous. Whether a defendant's conduct is "extreme and outrageous" is a question of law. *Bradford, 48 S.W.3d at 758.* The mere fact that a defendant's conduct is tortious or otherwise wrongful does not, standing alone, necessarily render it "extreme and outrageous." *Id.* Instead, to be "extreme and outrageous," conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).

Appellees respond that Cruickshank's conduct was extreme and outrageous because it is outrageous "for a person with the training, and vested with the authority, responsibility, and power of Cruickshank to withhold exculpatory information from the police and utterly fail to review that information himself when levying an allegation that was certain to result in the arrest of another human being, and likely to result in lengthy incarceration."

In *Bradford v. Vento, 48 S.W.3d 749, 44 Tex. Sup. Ct. J. 655 (Tex. 2001)*, Taylor and Vento, partners of a sports memorabilia store had a dispute over whether [*14] Taylor had sold the store to Vento. On separate occasions, each partner told Bradford, the manager of the mall in which the store was located, that he was the current owner of the store. One day, Taylor and Vento were in a heated argument in the store when one of them called the police. According to Vento, when asked by the police who owned the store, Bradford told the police that Taylor owned the store and threatened to file criminal

trespassing charges against Vento if he returned. *Id. at 758.* Bradford did not inform the police that there was a dispute over the ownership of the store. *See id.* The supreme court held that Bradford's conduct was not extreme and outrageous, noting that Bradford was trying to quell the disturbance in the mall, which he was within his legal rights to do. *Id.* The court emphasized,

Although Bradford could certainly have given the police more information than he did, his failure to do so was not extreme and outrageous. By responding to the police officer's question, Bradford was merely exercising his rights as mall manager in a permissible way; without more his behavior does not amount to extreme and outrageous conduct. [*15] *Id. at 759.*

Here, like Bradford, Cruickshank was merely exercising his legal right, in this case, his right to report that a crime had occurred. And, like Bradford, while Cruickshank could have reviewed the videotape to be certain of his identification and could have given the police the videotape, his failure to do so does not amount to extreme and outrageous behavior. We decline to hold that simply failing to review a videotape and failing to give the videotape to the police is conduct so extreme and outrageous as to go beyond all possible bounds of decency. As such, we hold that there is legally insufficient evidence to support the jury's finding that Cruickshank's conduct was extreme and outrageous. We sustain this issue.

## NEGLIGENT HIRING

Wal-Mart and Cruickshank also argue that there is no evidence to support the jury's negligent hiring finding. Claims against an employer for negligent hiring, supervising, training, or retaining an employee are based on the theory of direct liability--not vicarious liability. *LaBella v. Charlie Thomas, Inc., 942 S.W.2d 127, 137 n.9 (Tex. App.--Amarillo 1997, writ denied).* The elements of a cause of action [*16] for negligently hiring, supervising, training, or retaining an employee are the following: (1) the employer owed the plaintiff a legal duty to hire, supervise, train, or retain competent employees; (2) the employer breached that duty; and (3) the breach proximately caused the plaintiff's injury. *Id. at 137.* However, the employer cannot be held liable if the employee does not commit an actionable tort recognized under common law. *Gonzales v. Willis, 995 S.W.2d 729, 739-40 (Tex. App.--San Antonio 1999, no pet.).* As such, negligent hiring is a dependent tort. *Id.* Here, there is no evidence of an actionable tort committed by Cruickshank. We, therefore, sustain this issue.

## OTHER ISSUES

Wal-Mart and Cruickshank also complain that the trial court erroneously denied their motion to transfer venue and that the judgment improperly awards double recovery. [2] Because we have sustained Wal-Mart and Cruickshank's first three issues, we need not reach these other issues.

> 2 Appellees concede in their brief that the judgment does improperly award them double recovery.

## [*17] CONCLUSION

As there is legally insufficient evidence to support the jury's findings on malicious prosecution, intentional infliction of emotional distress, and negligent hiring, we reverse the judgment of the trial court and render judgment in favor of Wal-Mart and Cruickshank.

Karen Angelini, Justice

**DISSENT BY:** Alma L. Lopez

## DISSENT

## DISSENTING OPINION

In finding that the evidence is legally insufficient to support the probable cause element of the appellees' malicious prosecution claim, I believe the majority misapplies the applicable standard of review. For this reason, I respectfully dissent.

In conducting a legal sufficiency review, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 782, 45 Tex. Sup. Ct. J. 232 (Tex. 2001)*. If more than a scintilla of evidence exists, the evidence is legally sufficient. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id. at 782-83*. Because a court of appeals [*18] is not a fact finder, we may not pass upon a witness's credibility or substitute our judgment for that of the jury, even if the evidence would

clearly support a different result. *Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07, 41 Tex. Sup. Ct. J. 683 (Tex. 1998)*.

During oral argument, counsel for the appellants repeatedly stated that the issue of probable cause was a question of law. "Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the underlying facts." *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 518, 40 Tex. Sup. Ct. J. 839 (Tex. 1997)*. "When the facts underlying

the defendant's decision to prosecute are disputed, the trier of fact must weigh the evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact." *Id.* The facts in this case could not be more clearly in dispute. Cruickshank identified Aguilera as being involved in a theft offense. Aguilera testified that she was not present at the scene and had an alibi to support her testimony.

"Once [the] opposing parties have entered into a factual contest on the issue of probable cause, a factual issue is [*19] created for resolution by the trier of fact." *Akin v. Dahl, 661 S.W.2d 917, 920, 27 Tex. Sup. Ct. J. 23 (Tex. 1983)*. "This is the cornerstone of our judicial system." *Id.* "'When the facts are in controversy the question of probable cause must necessarily go to the jury, and then the court must give such instruction as will enable them to draw the correct conclusion from the facts as they may find them and the law thus given.'" *Id.* (quoting *Landa v. Obert, 45 Tex. 539, 543 (Tex. 1876))* (citations omitted).

In the context of a malicious prosecution cause of action, probable cause is defined as the existence of facts and circumstances that would excite a belief in a reasonable person, acting on the facts within his knowledge, that the person charged is guilty of a crime. *Richey, 952 S.W.2d at 517*. "The probable cause inquiry asks only whether the complainant reasonably believed that the elements of a crime had been committed based on the information available to the complainant before criminal proceedings begin." *Id. at 519*.

The key to the jury affirmatively finding no probable cause in this case is based on the facts it determined [*20] to be within Cruickshank's knowledge. Cruickshank testified that a videotape existed that showed every person involved in the offense. [1] Cruickshank testified that he gave that videotape to Officer Abbott, but Officer Abbott did not recall receiving the videotape. No evidence was introduced to prove that Cruickshank completed a log showing that he had given Officer Abbott the videotape in accordance with company policy. Furthermore, neither the evidence receipt Cruickshank allegedly received from Officer Abbott nor the videotape was produced at trial. From this evidence, the jury could make a credibility determination that Cruickshank did not give Officer Abbott the videotape.

> 1 Q: So, there's no question but had you looked at the videotape you could have compared it because you know you're positively sure of your photo identifications, they would have jibed.
>
> A: Yes, sir.

Cruickshank testified that he did not watch the videotape, but he also knew that his job performance was

based upon the number of apprehensions [*21] he made and the dollar value of the prevented theft. [2] From this evidence, the jury could make a credibility determination that Cruickshank had watched the videotape and infer that the videotape would not have supported Cruickshank's identification of Aguilera. This inference is bolstered by the evidence that Cruickshank identified at least one other individual as being involved in the offense who was not prosecuted based on alibi testimony. Based on the evidence as a whole, the jury could have disbelieved that the true facts within the knowledge of Cruickshank would excite a belief in a reasonable person that Aguilera was guilty of a crime. *See Akin, 661 S.W.3d at 921* (holding evidence supported jury finding of no probable cause where conflicting evidence was presented with regard to whether a reasonable basis in the known facts supported a belief that plaintiff was mentally incompetent even though physician records supported finding of mental incompetency); *San Antonio Credit Union v. O'Connor*, 2002 Tex. App. LEXIS 8406, No. 04-00-00714-CV, 2002 WL 31662054, at *7-8 (Tex. App.--San Antonio Nov. 27, 2002, no pet. h.) (holding jury could have found that complainant's belief [*22] that plaintiff misappropriated loan funds was unreasonable based on conflicting evidence); *First Valley Bank of Los Fresnos v. Martin, 55 S.W.3d 172, 184 (Tex. App.--Corpus Christi 2001, pet. filed)* (holding evidence supported no probable cause finding where evidence was presented that defendant could not have reasonably believed that plaintiff committed crime); *King v. Graham, 47 S.W.3d 595, 607-08 (Tex. App.--San Antonio 2001, no pet.)* (holding more than a scintilla of evidence existed to support finding of no probable cause where evidence was offered to show that defendant's version of the facts was inaccurate). "While the jury was not required to believe [Aguilera's] story and could have rejected it, it was certainly within the jury's province to accept it." *Richey, 952 S.W.2d at 521* (Cornyn, J., dissenting).

2    Interestingly, Cruickshank received a commendation letter and a raise for his actions relating to the theft offense.

The reason the jury could [*23] have chosen to simply disbelieve that Cruickshank honestly and reasonably believed that Aguilera was present during the offense could not be more heavily documented in the record. Cruickshank lied at his deposition about graduating from high school. Cruickshank lied at his deposition about receiving certain awards and medals while serving in the Navy. Cruickshank lied about needing authorization from the President of the United States before disclosing the reason for receiving one of those awards. Cruickshank admitted that he lied on his Wal-Mart application. Cruickshank's initial statement to the police identified only one other female assisting two juveniles with the theft by placing clothes on top of merchandise in a shopping cart. Cruickshank did not identify Aguilera's alleged role in acting as a lookout until his second statement was taken two days later. The jury could have questioned whether Cruickshank honestly believed that the additional individuals identified in his second statement were present given Cruickshank's failure to initially mention them and given that Cruickshank's performance was evaluated in part based on the number of apprehensions he made. Finally, the jury [*24] could have believed that Cruickshank lied about giving Officer Abbott the videotape and about not viewing the videotape. In sum, the jury had every reason to find that Cruickshank's testimony about the facts within his knowledge was false and that the facts that were within Cruickshank's knowledge would not excite a belief in a reasonable person that Aguilera was guilty of a crime.

Because I believe the majority passes upon the witnesses' credibility and substitutes its judgment for that of the jury, I respectfully dissent.

Alma L. Lopez, Chief Justice

# APPENDIX – "F"


LexisNexis®

James GONZALES, Appellant and Olga WILLIS, Appellant/Appellee v. Olga WILLIS, Appellee/Appellant and TOM BENSON CHEVROLET COMPANY, INC., Appellee

No. 04-97-00949-CV

COURT OF APPEALS OF TEXAS, FOURTH DISTRICT, SAN ANTONIO

*995 S.W.2d 729; 1999 Tex. App. LEXIS 3014*

**April 21, 1999, Delivered**
**April 21, 1999, Filed**

**PRIOR HISTORY:** [**1] From the 73rd Judicial District Court, Bexar County, Texas. Trial Court No. 96-CI-04401. Honorable Carlos C. Cadena, Judge Presiding.

This Opinion Substituted on Grant of Rehearing for Withdrawn Opinion of February 10, 1999, Previously Reported at: *1999 Tex. App. LEXIS 838.*

**DISPOSITION:** REVERSED AND RENDERED IN PART; AFFIRMED IN PART

**COUNSEL:** FOR APPELLANT: Tina Torres, Rob Hughes, Jr. LAW OFFICES OF PETER TORRES, JR., P.C., San Antonio, TX. Jeffrey R. Davis, OSHEROW & DAVIS, P.C., SAN ANTONIO, TX. Thomas H. Crofts, Jr., Ellen B. Mitchell, CROFTS, CALLAWAY & JEFFERSON, P.C., SAN ANTONIO, TX.

FOR APPELLEE: Humberto G. Garcia, John D. Mereness, JOHNSON, CURNEY, GARCIA, WISE & FARMER, P.C., San Antonio, TX.

**JUDGES:** Opinion by: Tom Rickhoff, Justice. Concurring opinion by: Karen Angelini, Justice, joined by Sarah B. Duncan, Justice. Sitting: Tom Rickhoff, Justice, Sarah B. Duncan, Justice, (concurring in the judgment only). Karen Angelini, Justice (concurring in the judgment only).

**OPINION BY:** TOM RICKHOFF

**OPINION**

[*732] **OPINION ON APPELLEE'S MOTION FOR REHEARING**

Appellee Tom Benson Chevrolet Company's motion for rehearing is granted. The prior opinions and judgment in this appeal, issued February 10, 1999, are withdrawn and the following opinion and judgment are substituted therefor.

**INTRODUCTION**

Olga Willis sued James Gonzales and his employer, Tom Benson Chevrolet Company, Inc. (Benson), claiming that Gonzales made sexual advances toward her while ostensibly assisting her in obtaining a job at Benson. She asserted claims for intentional infliction of emotional [**2] distress, sexual harassment, sexual discrimination, and negligent hiring, retention, training, and supervision. At trial, she prevailed only on the intentional infliction of emotional distress claim. The court entered a judgment against Gonzales on this claim for $ 55,000. Gonzales appeals this portion of the judgment. Willis appeals the trial court's decision to direct a verdict on her negligence claims. Although Gonzales's behavior could be considered extreme and outrageous, Willis did not establish that she suffered severe emotional distress. We therefore reverse the portion of the judgment awarding Willis $ 55,000, and render judgment that she take nothing on the intentional infliction of emotional distress claim. Because Gonzales did not commit an actionable tort against Willis, her claims for negligent hiring, retention, training, and supervision are precluded as a matter of law. We therefore affirm the portion of the judgment ordering that Willis take nothing on these claims.

## FACTS

Hoping to obtain a job selling cars, Willis contacted an acquaintance who was a sales manager at Benson. He told her she should talk to James Gonzales, another Benson employee, about [**3] getting a job there. At the time of the events giving rise to this suit, Gonzales had been twice fired and twice rehired by Benson. One time he was fired for bringing a pornographic movie to work to show at a meeting of salesmen. He was also reprimanded for pinching a female co-worker's buttocks. The second time he was fired, a notation was made on his record that he was not rehireable. He was rehired anyway.

During their first meeting, Gonzales informed Willis that she could not be hired at that time because she had no experience selling cars. He suggested that she seek a job at a used car lot called E-Z Motors. After Willis secured a job at E-Z Motors, she kept in touch with Gonzales: she submitted [*733] an application and resume, informed him when she made her first sale, and sought advice regarding problems she encountered at E-Z Motors. During these conversations, Gonzales suggested that she might be able to obtain a job at Benson if Benson has an opening. One day, Gonzales invited Willis to dinner to discuss a potential job. Willis accepted the invitation, and Gonzales, driving a Benson automobile, picked her up that night at E-Z Motors. Willis testified that on the way to dinner, [**4] he commented that she had "baby legs" and asked if he could touch them. Willis said "no" and tried to change the topic of conversation. During the remainder of the drive, they discussed selling cars. They arrived at the restaurant, a barbecue place, and resumed their discussion about selling cars. Willis testified that the following exchange occurred after their dinner was served:

So he starts getting his hands dirty [with barbecue sauce], and he say, "You know, I'm thinking about something." I said, "What are you thinking about?" He goes, "I'm thinking about, you know, my fingers are all with barbecue sauce. If you will let me stick barbecue sauce in finger--my finger in your pussy to see, you know, how it's like. And I'm sure when I'm telling you this, you're getting wet," and said, "I can see your tits getting hard," you know.

And then after that, you know, "Go bring by [sic] cock in your pussy and kiss you all over and, oh, it would be a lot of fun" and all kind of stuff. And I say, "Would you please stop? You know, I don't think this is nice to tell me that."

And, you know, constantly I'm trying to change conversation ..., and so I feel uncomfortable. So I ask him, [**5] "Can you--" you know, "Can we go back?" And he goes, "Sure."

When asked whether she got up from the table at that point, she responded:

I did not. I was embarrassed. I'm trying to keep, you know, nice with him, but I also show him that I was very, very uncomfortable [with] what he's telling me.

Although Gonzales initially agreed to take Willis back to E-Z Motors, he nevertheless continued his sexual advances:

He say, "Come on. You're not going to work anymore. Let's go stay and dance. I would like to close--dance with you real close. That way, I can feel your tits close to me. I want to see you. I want to feel your waist," and, you know, "Let's go stay." And I say, "No, I can't stay. I have to go work. I have long hours the next day; and besides that, they're going to close the dealer, and I will not be able to get my car out of the dealer--out of the parking lot."

Finally, after this protestation, Gonzales drove Willis back to E-Z Motors. She testified that on the way back to E-Z Motors:

I didn't say much. I was so embarrassed. I can't remember exactly what we talked about, so--I remember when we get to the lot, he--I tell him--I tell him, "Please, you know, don't [**6] keep these conversations with me anymore." He goes, "Okay, that's fine." And that was it.

Willis described her feelings at the end of the evening as follows:

I [felt] a little bit uncomfortable, but I'm trying ... to do my best, you know, not to think negative about him because I was looking at him as a person that was going to help me to get a job.

Sometime after their dinner together, Gonzales called Willis, told her he had won a trip to

Acapulco, and invited her along. When Willis declined the invitation, Gonzales told her, "One of my dreams if I take you to Acapulco is you--seeing you--seeing you in the shower, you know, taking a bath. I promise you I will not touch you. I will not do anything, just--but watch you there in the bathroom taking a bath." Willis informed Gonzales that she doesn't "take those trips." Undeterred, Gonzales called [*734] her back to ask again if she would go with him and again Willis told him no.

The next time Willis saw Gonzales he stopped by the dealership where she worked and invited her to lunch with this lure: "We're going to talk about a job. I think I have something for you." Willis told him she would go if he promised that he would not [**7] "say nasty things" to her. Gonzales responded, "I promise you. It's going to

be strictly about a job." Once he had Willis away from the dealership, however, he disregarded his promise:

We ordered the food and everything, and he told me, "You know, I'll help you if you help me." He started talking nasty again about me, about his dreams about sitting on the chair dreaming about me, about getting hard, about getting wet, about--dreaming about, you know, the way I take my bath, about sticking his finger in my pussy, and swallow the finger, and touching my tits, because he always tell me that I have beautiful tits.

And I say, "Do you know what? You promised me something, and you did it again. And, you know, I don't want to hear about it." .... He say, "I'll help you if you help me." And I say, "I don't need your help then," and I asked him to take me back.

Willis testified that her understanding of the comment, "I'll help you if you help me," was that she had to "pleasure him" in order to get a job. When he returned her to the dealership, she informed him, "not to bother me, not to call me anymore, that I don't want to hear about him anymore." In spite of this plea, Gonzales called [**8] her again to talk about her job. Willis reminded him that she had asked him not to call her anymore and then hung up on him.

Thus thwarted from having direct contact with Willis, Gonzales nevertheless managed to inject himself into her life. One day, he went to lunch with some of her co-workers. When the co-workers returned from lunch, they told Willis that Gonzales asked them to send her "a message" that he was still waiting for her to go to Acapulco with him and he was still dreaming about her.

Gonzales testified that his encounters with Willis were purely professional, and that he never made a sexual advance toward her.

When asked how Gonzales's conduct had affected her, Willis testified:

Every single time I remember things like this coming back over and over, it hurts me. He made me feel, you know--

And I even think about, "What did I do wrong for him to talk to me this way?" Because everybody, every single person I work for, they always respect me, any job, any position. I work between a lot of mens [sic], and I'm the only girl; and nobody talk anything nasty ... in front of me.

And when I met Mr. Gonzales--he is an older person--my education was that older people [**9] needs to be respected; and I always like to be close to older people, because the older people is the people who teach you best. And when he started talking to me, it hurts me because I didn't know what I did wrong; and I was afraid to talk to older people anymore. I'm afraid to get close to them. I'm afraid to believe in people again. I can't.

Willis further testified that when her co-workers conveyed Gonzales's "message":

They made me feel dirty. I even got home, took a shower, crying. I mean, I cannot sleep. Every single time I go to sleep, I can listen to voices. I can listen to his voice talking nasty with me.

After the event involving her co-workers, Willis resolved to take action against Gonzales:

That was the last thing I can took [sic], because I feel like he was making everybody lose respect for me. I work so hard for people at that particular dealer to believe in me and respect me, for him to come to them and say nasty things.

[*735] And then later on, I was afraid that somebody else was going to come to that office and say something nasty to me. And that really needs to stop.

Accordingly, Willis filed an administrative complaint against Gonzales and Benson. After [**10] receiving a "right to sue" letter from the Texas Commission on Human Rights, she brought this suit.

## GONZALES'S APPEAL

In *Twyman v. Twyman, 855 S.W.2d 619, 621-22 (Tex. 1993)*, our supreme court adopted the tort of intentional infliction of emotional distress as set out in *section 46(1) of the Second Restatement of Torts*. To recover for this tort, the plaintiff must prove: 1) the defendant acted intentionally or recklessly; 2) the conduct was extreme and outrageous; 3) the defendant's actions caused the plaintiff emotional distress; and 4) the resulting emotional distress was severe. *See Twyman, 855 S.W.2d at 621.* Gonzales argues that the evidence is legally and factually insufficient to establish the first, second, and fourth elements.

In reviewing legal sufficiency or "no evidence" arguments, we must consider the evidence and draw all inferences in the light most favorable to the verdict. *See Southwestern Bell Mobile Sys., Inc. v. Franco, 971 S.W.2d 52, 54 (Tex. 1998).* In reviewing factual sufficiency or "insufficient evidence" arguments, we must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming [**11] weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).*

### 1. Extreme and Outrageous Conduct

To be actionable, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *RESTATEMENT (SECOND) OF TORTS § 46 cmt. d* (1965). It has been noted that courts have little guidance in deciding when conduct crosses the line from the category of merely rude and offensive behavior to the category of extreme and outrageous conduct, and that the test is essentially a subjective one. *See Twyman, 855 S.W.2d at 629* (Hecht, J., concurring and dissenting); *GTE Southwest, Inc. v. Bruce, 956 S.W.2d 636, 646* (Tex. App.--Texarkana 1997, pet. granted). Generally, however, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *RESTATEMENT § 46 cmt. d*. The extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with the victim that [**12] gives the tortfeasor actual or apparent authority over the victim, or power to affect his or her interests. *See id.* cmt. e.

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *See Wornick Co. v. Casas, 856 S.W.2d 732, 734 (Tex. 1993)*; *RESTATEMENT § 46 cmt. h*. But when reasonable minds could disagree, it is for the jury to determine whether, in a particular case, the conduct is sufficiently extreme and outrageous to result in liability. *See RESTATEMENT § 46 cmt. h*. After evaluating the evidence in this case, the trial judge determined that a jury question was presented on this issue and the jury decided that Gonzales's conduct was extreme and outrageous.

Given these considerations, our task is to determine whether particular behavior in its surrounding context, could or could not, as a matter of law, amount to extreme and outrageous conduct. The behavior at issue in this case consists of vile sexual advances that were repeated in the face of persistent and unwaivering entreaties that the perpetrator refrain from making such comments. The behavior also [**13] includes encouraging the victim's co-workers to convey indecent propositions to the victim at her place of employment. The [*736] context in which the advances were made is also important. Clearly, Gonzales led Willis to believe that he could assist her in obtaining the job she desired at Benson. He thus acquired a position of power over her-- a position he used to subject her to his lecherousness. Considering this context and the demeanor of Willis and Gonzales, the jury could infer that Gonzales chose his victim well--a victim reluctant to "make a scene," a victim who would quietly endure the indignities cast upon her for fear of angering a person in power or being humiliated by her co-workers. To hold that this behavior cannot, as a matter of law, amount to extreme and outrageous conduct would be

tantamount to saying that no reasonable person, understanding the context, would exclaim, "Outrageous!" upon overhearing Gonzales's obviously unwelcome vulgarities. *See RESTATEMENT § 46 cmt. d*. At a minimum, reasonable minds could disagree regarding whether Gonzales's conduct was extreme and outrageous. Therefore, it was for the jury--the representatives of the community and the proper arbiters [**14] of what exceeds "the bounds of decency," and what is "atrocious, and utterly intolerable in a civilized community"-- to decide this question. *Id.*

We recognize that some courts have held that conduct similar to Gonzales's conduct was not extreme and outrageous. *See, e.g., Wilson v. Sysco Food Servs., 940 F. Supp. 1003 (N.D. Tex. 1996)*; *Gearhart v. Eye Care Ctrs., 888 F. Supp. 814 (S.D. Tex. 1995)*; *Garcia v. Andrews, 867 S.W.2d 409* (Tex. App.--Corpus Christi 1993, no writ). Other cases have held that similar conduct was extreme and outrageous. *See, e.g., Soto v. El Paso Natural Gas Co., 942 S.W.2d 671* (Tex. App.--El Paso 1997, writ denied); *Bruce, 956 S.W.2d at 647*. None of these cases is binding on us; their holdings merely provide proof that the extreme and outrageous standard is somewhat amorphous.

### 2. Intent or Recklessness

To be liable for intentional infliction of emotional distress, the defendant must have either intended to cause the distress or acted with reckless disregard of the risk that he would cause such distress. *See Twyman, 855 S.W.2d at 623-24*. Gonzales denied that he had any intent to cause Willis pain or make her uncomfortable [**15] or upset. Based on this testimony, he argues that the evidence is insufficient to establish intent or recklessness.

Defendants will rarely admit knowing of a substantial certainty that their conduct would cause emotional distress. *See 855 S.W.2d at 623*. Noting this fact, the supreme court has emphasized that juries are free to discredit the defendant's protestations that no harm was intended and draw necessary inferences to establish intent. *See id.* In this case, not only did Gonzales deny any intent to hurt Willis, he denied that he even engaged in the conduct that is the subject of this action. The jury could infer intent or at least recklessness from the nature of Gonzales's statements and from Willis's requests that he refrain from making such statements.

### 3. Severe Emotional Distress

Emotional distress includes all highly unpleasant mental reactions, such as humiliation, embarrassment, anger, worry, and disappointment. *See Villasenor v. Villasenor,*

*911 S.W.2d 411, 416* (Tex. App.--San Antonio 1995, no writ); *see also RESTATEMENT § 46 cmt. j.*

Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial [**16] emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.

*RESTATEMENT § 46 cmt. j.* Feelings of anger, depression, and humiliation are not sufficient to establish severe emotional distress. *See Villasenor, 911 S.W.2d at 417.* Furthermore, conduct is not actionable as intentional infliction of emotional distress [*737] merely because it may damage the plaintiff's reputation. *See Diamond Shamrock Ref. & Mktg. Co. v. Mendez, 844 S.W.2d 198, 202 (Tex. 1992).*

Willis testified that when Gonzales made the advances toward her she was merely "embarrassed" and "uncomfortable." She also testified that remembering what Gonzales did "hurts" her and makes her wonder what she did wrong; that his conduct has affected her ability to trust people, particularly older people; that the comments relayed by her co-workers made her feel dirty and made her cry; that she "cannot sleep," and when she goes to sleep she hears Gonzales "talking nasty" to her. Drawing all [**17] inferences in favor of Willis, the most that can be said of this testimony is that it is some evidence of a highly unpleasant emotional reaction. Willis failed to muster any evidence from which a jury could reasonably infer that her emotional distress has been *severe.* For example, there is no indication of the intensity or duration of the emotional distress. The evidence is therefore legally insufficient to establish severe emotional distress. *Cf. Gorges Foodservice, Inc. v. Huerta, 964 S.W.2d 656, 668-69* (Tex. App.--Corpus Christi 1997, no pet.) (testimony that plaintiff's wife temporarily ejected him from the house, that his relationship with his wife and children had suffered, that he was unable to concentrate, that he felt insecure about his prospects for finding employment, and that he was embarrassed held legally insufficient).

Because the evidence is legally insufficient to establish severe emotional distress, we reverse the portion of the judgment that awards Willis $ 55,000 in damages from Gonzales and render judgment that she take nothing on her intentional infliction of emotional distress claim.

## WILLIS'S APPEAL

In addition to her intentional infliction [**18] of emotional distress and negligence claims, Willis also alleged a violation of the Texas Commission on Human Rights Act (TCHRA). Regarding this claim, the jury found that Benson failed to hire Willis because she is female and that Gonzales sexually harassed her. But the trial court granted a take-nothing judgment on this claim because Willis's administrative complaint was not timely filed. *See TEX. LAB. CODE ANN. § 21.202(a); Specialty Retailers, Inc. v. DeMoranville, 933 S.W.2d 490, 492 (Tex. 1996).* The trial court also granted Benson's motion for directed verdict on Willis's negligence claims on the ground that those claims were preempted by the TCHRA. Willis argues that this ruling was erroneous. Benson argues that the finding of preemption was correct, or in the alternative, was harmless error.

### 1. Preemption

The TCHRA prohibits employment discrimination on a number of grounds, including sex. *See TEX. LAB. CODE ANN. § 21.051* (Vernon 1996); *Perez v. Living Centers-Devcon, Inc., 963 S.W.2d 870, 872* (Tex. App.--San Antonio 1998, pet. denied). It sets forth a comprehensive administrative review system that a discrimination victim must follow before filing [**19] a civil action alleging violations of the TCHRA. *See Schroeder v. Texas Iron Works, Inc., 813 S.W.2d 483, 485-88 (Tex. 1991).*

In *Perez,* we addressed the question of "whether the Texas legislature intended for the TCHRA to preempt common law causes of action." *963 S.W.2d at 873.* After examining the act's language, we stated:

Notably, neither an intent to serve as an exclusive remedy, nor an intent to preclude common law causes of action, is contained within the stated purposes of the TCHRA. Additionally, the statute contains no provision that implies the TCHR's administrative review system precludes a lawsuit for common law causes of action.

*963 S.W.2d at 874* (citation omitted). We further noted that *section 21.211* of the TCHRA implies that the legislature did not intend to preempt common law causes of action. *See id.* That section provides:

[*738] A person who has initiated an action in a court of competent jurisdiction or who has an action pending before an administrative agency under other law or an order or ordinance of a political subdivision of this state based on an act that would be an unlawful employment practice under this chapter may not file a complaint under this [**20] subchapter for the same grievance.

*TEX. LAB. CODE ANN. § 21.211.* Focusing on this section, we stated:

Rather than preclude other causes of action that might arise from an employment practice made unlawful

by the TCHRA, this language implies that a plaintiff cannot have two bites at the apple. That is, a plaintiff cannot first sue a defendant-employer for a non-TCHRA cause of action for conduct arising from the same facts as employment discrimination and then pursue a claim of employment discrimination through the administrative review system established under the TCHRA .... This provision requires a plaintiff to pick a remedy and permits a plaintiff like Perez to pursue common law causes of action that arise from the same facts as sexual harassment.

*Perez, 963 S.W.2d at 874.* After examining the language of the TCHRA, including *section 21.211,* and its legislative history, we concluded that the TCHRA is not the exclusive state law remedy for conduct that violates its provisions. *See 963 S.W.2d at 872-75.*

Based on *Perez,* Willis argues that the trial court erred by directing a verdict on her negligence causes of action. Benson responds that this case is distinguishable [**21] from *Perez* because unlike Perez, Willis attempted to pursue *both* a claim under the TCHRA and common law claims. As support for its argument, Benson focuses on our analysis of *section 21.211,* particularly the statements that a plaintiff must "pick a remedy" and is not allowed "two bites at the apple."

The fact that Willis pursued an administrative remedy does not change the preemption analysis. Nothing in *Perez* suggests that our no-preemption holding was limited to the facts of that case. The language of *section 21.211* was merely one of the reasons we cited for concluding that Perez's common law claims were not preempted. Moreover, the election of remedies provision in *section 21.211* does not apply to this case because Willis did not initiate suit on her common law claims *before* pursuing her claim under the TCHRA. [1] By exhausting her administrative remedies, Willis acted consistently with the legislative intent underlying the TCHRA. *See Schroeder, 813 S.W.2d at 486* (holding that the TCHRA's administrative process "clearly encourages compliance through voluntary resolution, conference, conciliation and persuasion--informal processes other than litigation").

1    Because Willis did not recover on her claim under the TCHRA, the common law election of remedies rule and one-satisfaction rule are also inapplicable. *See Stewart Title Guar.Co. v. Sterling, 822 S.W.2d 1, 7 (Tex. 1991)* (one-satisfaction rule prevents plaintiff from obtaining more than one recovery for the same injury); *Green Oaks, Ltd. v. Cannan, 749 S.W.2d 128, 131 (Tex. App.--San Antonio 1987)* (sole purpose of election of remedies doctrine is to

prevent double recovery for single wrong), *writ denied per curiam, 758 S.W.2d 753 (Tex. 1988).*

[**22]    Finally, Benson points out that three federal district court opinions, two of which are unpublished, have held that the TCHRA preempts common law causes of action. *See Cook v. Fidelity Investments, 908 F. Supp. 438, 442 (N.D. Tex. 1995); Hardy v. Fleming Food Co., 1996 U.S. Dist. LEXIS 3923,* No. H-94-3759, 1996 WL 145463, at *27 (S.D. Tex. March 21, 1996); *Bates v. Humana, Inc., 1993 U.S. Dist. LEXIS 20764,* No. SA-92-CA-432, 1993 WL 556416, at *11 (W.D. Tex. Oct. 12, 1993). Benson suggests that we should follow these decisions because our supreme court has held that federal decisions interpreting federal discrimination statutes may be instructive in construing the TCHRA. *See Specialty Retailers, 933 S.W.2d at 492.* The cases cited by Benson, however, do not interpret federal discrimination statutes; rather, [*739] they address the purely state-law question of whether the TCHRA preempts common law claims. Because their answer to this question is inconsistent with our own precedent, we decline to follow them.

The trial court erred by directing a verdict on Willis's negligence causes of action on the basis of preemption.

## 2. Absence of Underlying Tort

In its motion for rehearing, Benson asserts that even if the trial [**23] court's preemption ruling was erroneous, the granting of the directed verdict was harmless in light of our disposition of Gonzales's appeal. Benson argues that since Gonzales did not commit an actionable tort against Willis, it cannot be held liable for negligently hiring, retaining, training, or supervising Gonzales. [2] We agree.

2    For purposes of this discussion, there is no relevant distinction among negligent hiring, retention, training, or supervision. We will refer to all these torts collectively as "negligent hiring."

Although we have not found a Texas case directly on point, courts in other jurisdictions have held that an employer cannot be held liable for negligently hiring an employee unless the employee committed an actionable tort. *See Hays v. Patton-Tully Transp. Co., 844 F. Supp. 1221, 1223 (W.D. Tenn. 1993); Mulhern v. City of Scottsdale, 165 Ariz. 395, 799 P.2d 15, 18 (Ariz. Ct. App. 1990); Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 340 S.E.2d 116, 123-25 (N.C. Ct. App. [**24] 1986); Louis Marsch, Inc. v. Pekin Ins. Co., 140 Ill. App. 3d 1079, 491 N.E.2d 432, 437, 96 Ill. Dec. 386 (Ill. App. Ct. 1985).*

This rule comports with the fundamental tort principle that a person is not liable for negligence, no matter how egregious, unless the negligence causes a legally compensable injury. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 30, at 165 (5th ed. 1984). In the context of negligent hiring claims, if the employee did not commit an actionable tort, the plaintiff has not been injured in the eyes of the law; therefore, the employer's negligence has not caused a legally compensable injury.

This rule is also consistent with well-settled Texas precedent regarding negligent entrustment claims, which are akin to negligent hiring claims. *See Deerings West Nursing Ctr. v. Scott, 787 S.W.2d 494, 495-96* (Tex. App.--El Paso 1990, writ denied). To prevail on a claim for negligent entrustment of a vehicle, the plaintiff must establish not only that the owner was negligent in entrusting the vehicle, but also that the driver's negligent operation of the vehicle proximately caused damage to the plaintiff. *See Schneider v. Esperanza Transmission* [**25] *Co., 744 S.W.2d 595, 596 (Tex. 1987); Fidelity & Guar. Ins. Underwriters v. McManus, 633 S.W.2d 787, 790 (Tex. 1982); see also Rodgers v. McFarland, 402 S.W.2d 208, 210* (Tex. Civ. App.--El Paso 1966, writ ref'd n.r.e.) ("Obviously, an owner who is negligent in entrusting his vehicle is not liable for such negligence until some wrong is committed by the one to whom it is entrusted."). Analogously, to prevail on a claim for negligent hiring, the plaintiff should be required to establish not only that the employer was negligent in hiring the employee, but also that the employee committed an actionable tort against her. When this rule is applied here, it is apparent that Willis's negligence claims must fail. Because Willis did not present legally sufficient evidence to establish that she suffered severe emotional distress, she failed to establish that Gonzales committed an actionable tort. Therefore, assuming that Benson was negligent in hiring, retaining, training, and supervising Gonzales, Willis suffered no compensable injury as a result of this negligence.

We also note that the jury's finding that Gonzales sexually harassed Willis cannot provide the basis for Willis's negligence [**26] claims. As one court has stated:

Sexual harassment has never been a common law tort; as a cause of action, it is a statutory creation. A negligent supervision [*740] claim cannot be based solely upon an underlying claim of sexual harassment *per se,* because the effect would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law.

*Hays, 844 F. Supp. at 1223* (citation omitted). Moreover, if we allowed a sexual harassment finding to supply the basis for recovery on a negligent hiring claim, the statutory procedures and limitations applicable to such claims would be rendered superfluous. *See, e.g., TEX. LAB. CODE ANN. § 21.201* (Vernon 1996) (requiring exhaustion of administrative remedies); *id.* § 21.2585 (limiting available damages). [3] Accordingly, negligent hiring will be a viable cause of action in a sexual harassment case only if the harassment encompasses misconduct that is independently actionable under the common law, such as battery or intentional infliction of emotional distress. *See Hays, 844 F. Supp. at 1223.*

> 3 In this case, for example, Willis was precluded from recovering on her sexual harassment claim, in spite of the jury's favorable finding, because she did not timely file a complaint with the Texas Commission on Human Rights.

[**27]

We must affirm a directed verdict if the record discloses a ground that establishes, as a matter of law, that the movant was entitled to judgment, even though the ground was not embodied in the motion for directed verdict. *See Granato v. Bravo, 498 S.W.2d 499, 502* (Tex. Civ. App.--San Antonio 1973, no writ); *see also Texas Employers Ins. Ass'n v. Page, 553 S.W.2d 98, 102 (Tex. 1977); Connell v. Connell, 889 S.W.2d 534, 539* (Tex. App.--San Antonio 1994, writ denied). Because Willis failed to establish that Gonzales committed an actionable tort, her negligence claims are precluded as a matter of law. We therefore affirm the directed verdict on these claims.

Tom Rickhoff, Justice

**CONCUR BY:** Karen Angelini

**CONCUR**

I do not believe Gonzales's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *RESTATEMENT (SECOND) OF TORTS § 46 cmt. d* (1965). I agree with all other aspects of the [**28] majority opinion and therefore concur in the judgment.

Karen Angelini, Justice

# APPENDIX – "G"


LexisNexis®

THE METHODIST HOSPITAL, Appellant v. JOHN GERMAN, Appellee

NO. 01-09-00925-CV

COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON

*369 S.W.3d 333; 2011 Tex. App. LEXIS 10215*

December 29, 2011, Opinion Issued

**SUBSEQUENT HISTORY:**    Released for Publication July 27, 2012.
Rehearing denied by *Methodist Hosp. v. German, 2012 Tex. App. LEXIS 6246 (Tex. App. Houston 1st Dist., Apr. 19, 2012)*
Petition for review denied by *German v. Methodist Hosp., 2013 Tex. LEXIS 408 (Tex., May 17, 2013)*

**PRIOR HISTORY:**  [**1]
On Appeal from the 125th District Court, Harris County, Texas. Trial Court Case No. 2003-30417.
*In re Methodist Hosp., 2009 Tex. App. LEXIS 4993 (Tex. App. Houston 1st Dist., June 26, 2009)*

**JUDGES:** Panel consists of Justices Keyes, Sharp, and Massengale. Justice Sharp, concurring without opinion.

**OPINION BY:** Michael Massengale

**OPINION**

[*336] This is a medical malpractice case against a hospital involving the care provided by its nurses. Appellee John German was admitted to The Methodist Hospital for surgery to repair a congenital heart defect. A tragic surgical error committed during his first heart surgery required additional surgeries and interventions. German survived, but only after suffering the amputation of one leg, one foot, and most of his fingers.

German filed suit to recover damages for injuries arising from the original surgery and his subsequent course of treatment. After settling with his doctors, he proceeded to trial against the sole remaining defendant, The Methodist Hospital. German sought to hold Methodist responsible for the acts of its nurses, alleging that the nurses failed to notice that he was having a danger-ous reaction to medication, and that their failure to take appropriate action led to the eventual amputations. German also alleged that Methodist did not properly train its nurses to [**2] recognize and appropriately respond to his symptoms.

The jury awarded damages to German based on findings that Methodist was negligent and was 50% responsible for the injuries. The jury also found that the hospital had acted with conscious indifference in providing medical care and awarded exemplary damages. The trial court entered judgment on the verdict in German's favor. Among other things, the hospital contends on appeal that the evidence was legally insufficient to support the verdict, primarily because critical testimony by German's expert witness was unreliable and conclusory.

Because there is no evidence of at least one element of each of German's theories of negligence, we reverse the trial court's judgment and render a take-nothing judgment in favor of The Methodist Hospital.

**Background**

John German, then a 32-year-old mechanic, was admitted to The Methodist Hospital for surgery to correct a congenital heart defect. During the surgery, Dr. Mahesh Ramchandani committed a serious error by puncturing German's healthy mitral valve. The puncture resulted in a condition known as acute mitral valve regurgitation, which caused blood to flow backwards through the heart and which would [**3] have been fatal if left untreated. Ramchandani attempted to repair the valve during this surgery by suturing it, [*337] but a variety of serious medical conditions over the following two days indicated that the attempted repair was not successful. On two consecutive days, doctors performed additional open-heart surgeries, attempting again to repair the

valve and then, upon the realization that the valve was irreparably damaged, ultimately replacing it. During each surgery, German was placed on a cardiopulmonary bypass machine (also known as a heart-lung machine). After the second failed valve repair, an extracorporeal membrane oxygenation machine (or ECMO) was also used to provide external cardiopulmonary support. Both the heart-lung machine and the ECMO required use of a blood-thinning medication, and for this reason German was given heparin, an FDA-approved anticoagulant. These were the only times that German received heparin during this hospital stay, and it was administered by the doctors themselves, not the nurses in the cardiovascular intensive care unit. After each surgery, German received care in the hospital's cardiovascular ICU.

Over the course of eight days beginning with his original [**4] surgery, German experienced, among other things, cardiac distress, multi-system organ failure, life-threatening bleeding, and low blood pressure. He required multiple blood transfusions, prompting the doctors to artificially elevate his blood pressure through the use of drugs known as vasopressors. German also experienced a significant decline in his blood platelet count, weak pulses, and other signs of blood clotting in his extremities. At trial, German's expert witness testified that these symptoms could indicate a rare adverse reaction to heparin called heparin-induced thrombocytopenia, also known as HIT. But German's expert conceded that these symptoms were also consistent with the numerous surgical interventions and medications that had been administered, and some of German's doctors testified that at the time of treatment they believed the symptoms were caused by factors other than HIT. For example, German's decreased platelet count was consistent with the mitral valve regurgitation resulting from the punctured valve, and it was also consistent with the repeated use of the heart-lung machine and ECMO during German's treatment, both of which had the effect of decreasing platelets. [**5] His weak pulses were consistent with the use of vasopressors, which constricted blood vessels and had the effect of depriving the capillaries in his extremities of blood in order to keep blood flowing to the brain and other vital organs.

The treating doctors testified without contradiction at trial that German would have died without these surgical interventions. Unfortunately, the doctors could not restore circulation to his extremities, and German later underwent surgery to amputate his left leg above the knee, all of his fingers, and all of the toes and part of his right foot.

German filed a medical malpractice lawsuit against his treating physicians and Methodist. He settled all of his claims against the doctors, and he proceeded to trial solely against Methodist on a theory that he had HIT,

that it was preventable, and that the negligent failure to prevent it resulted in his amputations. German alleged that Methodist was liable for the negligence of its cardiovascular ICU nurses who failed to recognize the signs and symptoms of HIT and failed to alert the doctors to these conditions. In addition, German alleged that Methodist negligently failed to train its cardiovascular ICU nurses [**6] about HIT. Finally, German alleged that Methodist and its nurses acted with conscious indifference in caring for him.

The jury found that Methodist was negligent and acted with malice, and it awarded [*338] compensatory and exemplary damages to German. The final judgment awarded $7,116,095.89 to German on his claims against Methodist.

**Analysis**

In its first three issues, Methodist challenges the sufficiency of the evidence to support the jury's negligence findings. The elements of a medical negligence claim are: (1) a duty to conform to a certain standard of care; (2) a failure to conform to the required standard; (3) actual injury; and (4) a causal connection between the conduct and the injury. *See, e.g., Mariner Health Care of Nashville, Inc. v. Robins, 321 S.W.3d 193, 205 (Tex. App.--Houston [1st Dist.] 2010, no pet.).* A medical malpractice plaintiff must present evidence of a reasonable medical probability that the alleged injuries "were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 399-400 (Tex. 1993).* Methodist argues [**7] there was no evidence that its nurses breached a duty under a legally proper standard of care, no evidence that any alleged breach caused German's injuries, and no evidence of any standard of care for the nurses' training.

When a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it. *City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).* We will sustain a no-evidence point when:

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)* (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960)). We review the factual sufficiency of the evidence to support a jury verdict by considering and [**8] weighing all the evidence, and we will set the verdict aside "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)*.

Two distinct theories of Methodist's negligence were presented at trial. German contended that Methodist was responsible for the negligent failures of its nurses to know the adverse effects of heparin, to appropriately document and report them, and to initiate the hospital's internal chain of command when the doctors did not diagnose HIT. German's other theory was that the hospital failed to train its nurses properly. To demonstrate the insufficiency of the evidence to support the jury's finding of negligence, Methodist must demonstrate the absence of evidence to support at least one element of each theory. As to the theory based on the nurses' alleged failures, Methodist argues that a critical component of German's proposed standard of care conflicted with Texas law by effectively requiring the nurses to diagnose German's symptoms as HIT, and therefore the proposed standard was not supported by any legally sufficient evidence. Moreover, Methodist contends that there is no [**9] evidence that the nurses breached any other duty or that any such breach caused German's injuries. With respect to the alleged failure to train, [*339] Methodist argues that German offered no evidence of the standard of care for training nurses. We will address each of German's liability theories and Methodist's contentions in turn.

## I. Negligence of Methodist's nurses

### A. Standard of care--nurses' alleged duty to identify and act upon symptoms of medical condition

Methodist challenges the sufficiency of the evidence to establish certain aspects of the standard of care applicable to nurses, and it argues that the standard of care propounded by German's expert is legally flawed. Because determination of the standard of care in medical malpractice requires knowledge and skills not ordinarily possessed by lay persons, evidence of the applicable standard of care and its breach is usually established by expert testimony. *See Jelinek v. Casas, 328 S.W.3d 526, 533 (Tex. 2010)* (causation); *Battaglia v. Alexander, 177 S.W.3d 893, 899 & n.7 (Tex. 2005)* (standard of care). Methodist's arguments implicate the sufficiency of German's expert testimony--both the expert's opinions and

the reliability of the information [**10] upon which he relied in forming his opinions.

Challenges to expert opinions ordinarily arise in the context of rulings on their admissibility, which are reviewed for an abuse of discretion. *See Whirlpool Corp. v. Camacho, 298 S.W.3d 631, 638 (Tex. 2009)*. But in some cases, as here, a party asserts on appeal "that unreliable . . . expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." *Id.* "Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004)* (quoting TEX. R. EVID. 401). In such cases, courts must determine if the testimony is sufficiently reliable to make it probative of a material fact. *See Whirlpool, 298 S.W.3d at 637*. "[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999)*. "It [**11] is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury." *Jelinek, 328 S.W.3d at 536*.

Dr. Akella Chendrasekhar was designated as German's expert witness on the standard of care for nursing care. Before trial, Methodist challenged Chendrasekhar's qualifications, and the trial court held a two-day hearing on a motion to exclude his testimony. While permitting much of Chendrasekhar's proposed testimony, the trial court ruled that he could not testify that the nurses should have diagnosed HIT. Nevertheless, at trial Chendrasekhar opined that the nurses' standard of care required them to recognize clotting signs and a downward platelet trend as symptoms of HIT, to report them to the physicians as such, and ultimately to use the hospital's internal chain of command to get "satisfaction" when the doctors failed to diagnose HIT and treat German accordingly.

Methodist argues that Chendrasekhar's opinion about the standard of care conflicted with legal prohibitions against the practice of medicine by nurses because his proposed standard required the nurses not only to recognize and report the objective data that German's platelet levels were dropping [**12] or fluctuating, but also to take the further step of diagnosing HIT. That is, Methodist contends that under Chendrasekhar's [*340] proposed standard of care, the nurses would have been required to conclude that German's platelet levels were dropping or fluctuating because he had HIT and that the doctors had misdiagnosed German by not concluding that he had HIT. Methodist contends this proposed standard of care is incorrect as a matter of law, and thus

Chendrasekhar's testimony in this regard is no evidence of the standard of care.

In response, German argues that he never sought to impose liability on the hospital because its nurses failed to make a medical diagnosis. Rather, German contends that the nurses had a statutory duty to know, document, and report the effect of medications and treatments administered to patients. German contends that the nurses should have known that HIT is an adverse effect of heparin, should have recognized that the signs and symptoms they observed were consistent with HIT, and should have communicated that information to the treating physicians.

At trial, Chendrasekhar testified that his qualifications included intensive care work during his residency, a post-residency [**13] critical care fellowship, and practice of critical care medicine since 1994. He is board certified in general surgery, critical care medicine, and surgical critical care. He has taught doctors and medical students, and he served as the assistant director and director of trauma and critical care medicine at Iowa Methodist Medical Center for eight years. At the time of trial, he was the director of trauma and critical care at Lincoln Hospital in New York. He testified that he served as the chairman of the quality improvement committee, which encompassed nursing as well as medical care improvement. He testified that he had interacted with nurses on the care and treatment of HIT and that he had reviewed nursing literature pertaining to HIT.

Chendrasekhar's testimony included reading from several nursing journals, including an article entitled "Bleeding complications in the patient with cardiac disease following thrombolytic and anti-coagulant therapies" from *Critical Care Nursing Clinics of North America*, which he said was relevant to the nurses' standard of care. The article stated:

> While the patient is receiving heparin, the platelet count should be monitored regularly, and any downward [**14] trends in the count reported, as well as any change in pulsation or color of an extremity. The nurse should observe for poor capillary refill, weakened or absent pulses or other signs of decreased perfusion, such as decreased urinary output or neurologic changes, which may indicate emboli.

He also read an excerpt from "Heparin-induced thrombocytopenia" published in the *Journal of Vascular Nursing*, which stated: "Nurses are responsible for recognizing and reporting the signs and symptoms of HIT syndrome." Chendrasekhar specifically opined that in the case of German's treatment, Methodist's nurses had the following duties under their standards of care:

> o The nurses have a responsibility to notify a physician if a patient is having an allergic reaction to a medicine. He testified that "HIT is--thrombocytopenia in this setting related to HIT is an allergic reaction."

> o The nurses should have recognized German's clotting signs and downward platelet trend as signs and symptoms of HIT, and they should have informed the treating physicians.

> o Although all the doctors "missed" the diagnosis of HIT, the nurses should have caught it.

> [*341] o The nurses have a responsibility to use the chain of command to [**15] inform superiors "if they don't get an appropriate response from the physician," and they should have done so in this case.

Despite his opinion that the applicable standard of care required that the nurses recognize and report the symptoms as indicative of HIT, Chendrasekhar nevertheless also confirmed that German's many symptoms and complications were also consistent with diagnoses other than HIT, such as the decreased platelet levels being consistent with his acute mitral valve regurgitation.

On cross-examination, Chendrasekhar testified that he did not know that there was a Texas statute that governed the practice of nursing, had never heard of the North American Nursing Diagnosis Association, and was unaware of licensing or continuing education requirements for nurses in Texas. He also did not know whether Texas excluded medical diagnosis from the practice of nursing.

In contrast to Dr. Chendrasekhar's opinions about the nurses' duties and the applicable standard of care, Nurse Kathy Knaack, the nursing director of Methodist's cardiovascular intensive care unit, testified that a nursing diagnosis is "based off the nurse's assessment, a problem in the patient that they can address [**16] based on their education and license." She distinguished a nursing diagnosis from a medical diagnosis in that a "medical diagnosis has to do with the medical condition of the patient in which the physician would order specific treatments; a nursing diagnosis has things to do with what a nurse can do to intervene and support the medical diagnosis." She also testified that the North American

Nursing Diagnosis Association, or NANDA, sets standards for acceptable nursing diagnoses. The 2001-2002 NANDA manual, which was admitted into evidence at trial, defined "nursing diagnosis" as "[a] clinical judgment about individual, family, or community responses to actual or potential health problems/life processes. A nursing diagnosis provides the basis for selection of nursing interventions to achieve outcomes for which the nurse is accountable." NANDA, NURSING DIAGNOSES: DEFINITIONS & CLASSIFICATIONS 2001-2002, at 245 (Marjory Gordon et al., eds., 2001).

Knaack offered her opinion that a doctor's order is required for the administration of medication, but a nurse is nevertheless required to know why a medication is ordered and its effects. This includes adverse reactions, such as the risk of bleeding [**17] associated with giving a patient a blood-thinning medication like heparin. She also testified that Methodist's nurses do not--and legally cannot--make medical diagnoses, because nurses are not educated or licensed to do so. Nurse Virginia Hathaway, a certified critical care registered nurse who cared for German in the cardiovascular ICU, also testified that a diagnosis of HIT is a medical diagnosis that a nurse cannot make.

Both Methodist and German rely on the Nursing Practice Act and its implementing regulations in the Texas Administrative Code as defining the standard of care for nurses applicable to this case. *See TEX. OCC. CODE ANN. §§ 301.001-301.307* (West 2004 & West Supp. 2010) (Nursing Practice Act); *22 TEX. ADMIN. CODE §§ 213.1-227.6 (2010)*. Although these regulations have been amended since the events giving rise to German's claims, neither party argues that any change is relevant to this appeal. *Rule 217.11 of the Texas Administrative Code*, entitled "Standards of Nursing Practice," defines the "minimum acceptable level of nursing practice" for a given setting. *See 22 TEX. ADMIN. CODE § 217.11*. Among the standards applicable [*342] to all nurses are the requirements that a nurse [**18] know the rationale for and effects of medications and treatments and correctly administer them, as well as accurately and completely reporting the patient's signs, symptoms, and responses. *Id. § 217.11(1)(C), (D)*.

In defining "professional nursing," the Nursing Practice Act specifically excludes "acts of medical diagnosis." *TEX. OCC. CODE ANN. § 301.002(2)* (West Supp. 2010). Furthermore, the Act specifically states that it "does not authorize the practice of medicine as defined by Chapter 151" of the Occupations Code. *See id. § 301.004(b)*. The Medical Practice Act defines "practicing medicine" to include "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." *Id. §*

*151.002(a)(13)*. Medical diagnosis is commonly understood to be the determination of the cause and nature of a patient's condition. *See, e.g., Loper v. Andrews, 404 S.W.2d 300, 304-05 (Tex. 1966); Texas Employer's Ins. Ass'n v. Sauceda, 636 S.W.2d 494, 498 (Tex. App.--San Antonio 1982, no writ)*.

Both Methodist and German agree that nurses cannot legally make medical diagnoses. Methodist [**19] argues that Chendrasekhar's stated standard of care required exactly that. In response, German argues that the Chendrasekhar's standard of care required no more than for the nurses to know and report the effects of the medications they administer, because Chendrasekhar testified that HIT is an allergic reaction to heparin.

German received heparin only during his surgeries and only when administered by a doctor. The Standards of Nursing Practice required the nurses assisting with German's care to know the rationale for and effects of using heparin, as well as to accurately and completely report and document German's status, including his signs, symptoms, and responses. *See 22 TEX. ADMIN. CODE § 217.11(1)(C), (D)*. The nurses' duties thus included accurately and completely reporting the signs, symptoms, and responses relied upon by German's treating physicians (and later relied upon by Chendrasekhar in the formation of his opinions), such as German's falling or fluctuating platelet levels and intermittent weak pulses. These signs, symptoms, and responses were consistent with more than one medical or clinical cause, not just HIT. Determining that these clinical findings actually were symptoms [**20] of HIT--as opposed to side effects of German's ongoing treatment or symptoms of some other disorder such as acute mitral valve regurgitation--would have required the nurses to analyze the cause and nature of German's condition. This is a medical diagnosis, prohibited to nurses under Texas law. *See TEX. OCC. CODE ANN. § 301.004(b)* (Nursing Practice Act); *id. § 151.002(a)(13)* (Medical Practice Act). Accordingly, the signs, symptoms, and responses the nurses were obliged to report and document could not have included the characterization or diagnosis of the symptoms as being indicative of HIT.

Chendrasekhar's proposed standard of care effectively required the nurses to engage in the unauthorized practice of medicine by making a medical diagnosis. Anything that could be characterized as the practice of medicine is expressly excluded from the scope of professional nursing in Texas as defined by the Nursing Practice Act. *See TEX. OCC. CODE ANN. § 301.004(b)*. The nurses had no legal duty to draw any conclusion from their observations about the patient's signs, symptoms, and responses that would have required a medical diagnosis. Chendrasekhar's testimony [*343] suggesting otherwise constituted no evidence [**21] of a higher

standard of care because such a standard would impermissibly hold nurses to standard higher than that allowed by law. *See Birchfield v. Texarkana Mem'l Hosp., 747 S.W.2d 361, 365 (Tex. 1987)* (expert's opinion on a mixed question of law and fact must be predicated on "proper legal concepts"); *Schneider v. Haws, 118 S.W.3d 886, 889-90 (Tex. App.--Amarillo 2003, no pet.)* (medical malpractice expert witness's attempt to impose upon a doctor and his assistant "a standard of care greater than that compelled by law . . . constituted no evidence, as a matter of law, of the applicable standard of care"). The nursing journals entered into evidence also were no evidence that a nurse should interpret certain symptoms as indicating HIT. Instead, consistent with the definition of professional nursing in Texas, *see 22 TEX. ADMIN. CODE § 217.11(1)(C), (D)*, they merely stated that, when a patient receives heparin, a nurse should: monitor and report downward trends in platelet count; report "any change in pulsation or color of an extremity"; "observe" certain signs including "poor capillary refill, weakened or absent pulses or other signs of decreased perfusion"; and "report" such "signs [**22] and symptoms."

In addition, Chendrasekhar's testimony that he was unaware of the Texas statutes governing or restricting nursing practice made his testimony about the standard of care unreliable. *See Whirlpool, 298 S.W.3d at 637, 642.* Although Chendrasekhar testified about his extensive experience in intensive care, including working with and reviewing the work of nurses, Chendrasekhar did not provide any basis for his opinion that the nurses' standard of care required them to determine that a patient suffered from HIT and then act upon that determination. Any such opinion in this case necessarily required reference to the relevant legal restrictions on the practice of nursing, yet Chendrasekhar's opinion could not account for these restrictions considering that he admitted being ignorant of their substance. Thus, to the extent that he testified that the nurses should have recognized German's symptoms as signs of HIT and characterized them as such, this testimony is no evidence of the applicable standard of care because of its fundamental unreliability.

We hold that German offered no evidence of any standard of care effectively requiring the nurses to diagnose HIT. This holding does [**23] not mean that a nurse has no duty to recognize and appropriately report or otherwise act on the signs and symptoms of a dangerous allergic reaction. Instead, consistent with the complementary provisions of the Medical and Nursing Practice Acts, we hold that Texas law specifies that it is the doctor, not the nurse, who draws medical conclusions from the information observed and reported by the nurse. Only doctors are legally authorized to make a medical diagnosis by evaluating a patient's medical treatment and the development of subsequent symptoms to conclude

that a particular medical condition has resulted. This is particularly true when, as occurred in this case, the signs and symptoms observed by a nurse are consistent with more than one disease, syndrome, or cause. Opinion testimony about the standard of care in a medical malpractice case cannot be used to expand this responsibility to nurses in conflict with Texas statutes and regulations governing the nursing profession. To the extent Chendrasekhar also opined that Methodist's nurses should have gone over the heads of German's treating doctors to seek "satisfaction" when those doctors did not diagnose German with HIT and treat [**24] him [*344] accordingly, we hold that such testimony also fails because it is based on the same flawed premise that the nurses effectively could be required to diagnose HIT.

**B. Breach and causation--adequacy and effect of nurses' observations and reports**

The nurses' failures to identify HIT and act in accordance with Dr. Chendrasekhar's opinion of their duties in that regard were not the only theories of Methodist's negligence presented at trial. German also contended that the nurses failed to observe and properly communicate to the doctors the presence of symptoms that may have indicated HIT. In particular, German argues that he presented evidence that the nurses failed to document and report to the physicians his downward trend in platelet counts, weak pulses, and clotting signs. Chendrasekhar testified that the nurses failed to satisfy their duty to document and communicate this information to the doctors. German thus argues that the evidence supports the jury's verdict that acts of negligence attributable to the hospital proximately caused his injuries.

Methodist argues both that there is no evidence that the nurses failed to report completely on German's signs and no evidence that the nurses' [**25] actions caused German's injuries and amputations. In particular, Methodist points to the evidence in the record about the thorough nursing assessments conducted in the cardiovascular ICU and the physicians' testimony that they would not have done anything differently if the nurses provided more information.

**a. Adequacy of nurses' observations and communication**

Chendrasekhar testified that the nurses should have known the potential adverse effects of heparin, but their deposition testimony showed their knowledge was inadequate. For example, Methodist's nurses testified that heparin can cause excessive bleeding, but they did not indicate awareness that clotting was one of the drug's potential adverse effects. When German's blood pressure and pulses did not correlate, according to Chendrasekhar

the discordant pressure data implied "that some other process is going on, like--that's within the blood vessel, such as clotting. Because you are not feeling a pulse yet the blood pressure is such that you should be feeling a pulse." He testified that the nurses should have recognized that the blood pressure was discordant and "at least informed the physician that was caring for him"; that the nurses [**26] should have noticed a significant drop in German's platelet counts from the time of his admission to the hospital to the time of each assessment; and that they should have reported trends in his clotting signs as well.

Nurse Knaack testified that, consistent with hospital procedure, the nurses performed a head-to-toe, hands-on nursing assessment of German within one hour of each admittance to the cardiovascular ICU after surgery and every four hours thereafter. In doing so, a nurse examined all of German's major organ systems by sight, touch, and measurements with medical equipment, as well as by speaking to him when possible. For example, the cardiovascular part of the assessment required the nurse to monitor German's heart sounds with a stethoscope, to touch his neck veins to assess cardiac function, to look for swelling throughout his body, to check for pulses by touching his arms, feet, and other body parts or by using a Doppler machine, and to squeeze his nail beds and watch the color return to determine capillary refill time. The cardiovascular ICU nurses also monitored German's [*345] vital signs--either every hour or every 15 minutes--when he received certain medications. This monitoring [**27] included his blood pressure, respiratory rate, temperature, heart rate, pulmonary artery catheter reading, drip medication and pulmonary status, oxygen or ventilator status, and neurological assessment. The vital signs and the information from the periodic hands-on, head-to-toe assessments were stored in German's bedside computer, which could be accessed by every member of the cardiovascular ICU.

Knaack also testified about the importance of continuity of care, which required communication among the patient's health care providers. Continuity of care included both written nursing records and verbal bedside updates from the nurses to the health care providers. Knaack testified that a nurse updates a doctor on "her clinical assessment findings . . . anything related to the medications that the patient is receiving [and] lab work or test results." She testified that the standard of care does not require the nurse to record verbatim what she told the doctor; rather, the standard of care is satisfied if the nurse simply notes, "update given."

Cardiovascular ICU nurses at Methodist follow nursing standards based on those set by the American Association of Critical Care Nurses. Knaack reviewed [**28] the nurses' notes from the relevant time period.

During German's critical first days in the cardiovascular ICU, nurses performed more than 30 head-to-toe nursing assessments. Knaack testified that they were done within one hour from the time German was admitted or readmitted to the ICU and every four hours thereafter. These assessments included monitoring blood pressure and looking for signs of clotting. The nurses monitored German's pulses and platelet counts during this same period, testing his platelet counts ten times. Knaack also testified that a bedside computer is assigned to each patient for the purpose of documenting the medical record and nursing notes. Nurses access laboratory results, including platelet levels, through the bedside computer. All the doctors, respiratory therapists, and physical therapists, as well as the dietician and pharmacist, also had access to the laboratory results through the bedside computer.

Dr. Faisal Masud, a critical care anesthesiologist and cardiac anesthesiologist, worked at Methodist's cardiovascular ICU and treated German there. Methodist employed around-the-clock cardiovascular ICU physicians and critical care specialists, so that physicians [**29] were available at all times if a nurse needed to contact a specialist. Masud explained that the nurses work with the cardiovascular ICU team of surgeons, critical care specialists, residents, physicians' assistants, and nurse practitioners. He testified that nurses are an important part of patient care, serving "continuously at the bedside" because "no physician can be continually at the bedside." He characterized the nurses' role as an "integral part of anything," explaining that physicians provide instruction to the nurses, that the physicians and nurses routinely exchange information, with nurses reporting significant changes to the physician or other appropriate team member. Although he reviewed the nursing notes at times, he relied on the nurses' verbal updates about changes in a patient's status. Masud explained that both as his general practice and specifically in the case of German's treatment, he listens to the nurses and actively evaluates and treats the patient while he is at the bedside.

Chendrasekhar opined that the nurses' failure to recognize and act on the signs and symptoms of HIT proximately caused [*346] German's injuries. Again we look to the basis of his opinions. *See Whirlpool Corp., 298 S.W.3d at 637.* [**30] Although the nurses could not be required to make a medical diagnosis of HIT, they were required to accurately and completely report German's signs, symptoms, and responses. *See 22 TEX. ADMIN. CODE § 217.11.* There is no evidence supporting Chendrasekhar's opinion that they failed to do so in the sense that the relevant information was not actually observed and documented. Nurse Knaack testified that the nursing record included notes on clinical assessments done in accordance with the one-hour and four-hour standards set by the hospital and that these assessments

included checking blood pressures, pulses in German's extremities, and looking for signs of clotting. In other words, the head-to-toe nursing assessments included the very signs and symptoms that Chendrasekhar testified would be present in a patient who had HIT. And, critically, Chendrasekhar himself testified that the doctors were provided all of the information they needed to diagnose HIT, including information about German's weak pulses and falling platelet levels. Although he criticized the nurses' alleged failure to identify trends in the information they recorded and the adequacy of the nurses' verbal reports to the doctors, [**31] such as their failure to verbally report about German's downward trending platelet count and fluctuating pulses at a critical point in time, he acknowledged that the nurses had documented the underlying information in their assessments, which were available to the doctors. He thus agreed that the doctors should have been able to make a diagnosis of HIT with the information available to them—the same information he relied upon to conclude that German's symptoms indicated HIT. Methodist's nurses observed and documented all of this information, upon which German's physicians contemporaneously relied for their treatment decisions.

The nursing notes indicate that treating physicians were frequently at German's bedside while the nurses were there monitoring and caring for German. Having reviewed the record, including those portions of the record identified in German's briefing as supportive of his claim, we find no evidence that the nurses failed to fully discharge their duties to accurately and completely document the patient's signs, symptoms, and responses. Accordingly, the only possible remaining theories upon which the jury could have concluded that the nurses failed to satisfy the nursing [**32] standard of care are the possibilities that the nurses' duty to report information included the duty to identify trends in that information or to verbally communicate particular information at a particular time. We need not express any opinion about whether the evidence would have supported a finding of breach on these narrow theories because, as explained below, there is no evidence that any breach of that nature caused German's injuries.

**b. Effect of nurses' reports on treatment decisions by German's physicians**

As suggested above, German contends that it was not enough for the nurses to observe and record information. Chendrasekhar testified that the nurses should have identified a downward trend in German's platelets, that they should have specifically informed a treating physician of that trend, and that their failure to do so caused German to lose his fingers, a leg, and a foot. Chendrasekhar also testified about a particular incident immediately before German's second surgery, in which Dr. Michael Reardon, the co-director of the ICU, was present when German began to descend into cardiac arrest. A nurse [*347] asked for Reardon's assistance. Reardon placed German on the heart-lung machine, [**33] administering heparin in the process. Chendrasekhar offered his opinion that a nurse should have told Reardon about the downward platelet trend, and if she had, a hematology consult should have been ordered, HIT should have been diagnosed, and ultimately heparin should not have been used.

Dr. Reardon confirmed that when the nurse asked him for help, he was not specifically made aware of any downward trend in German's platelets and he did not call for a hematology consult. He looked only at the daily lab work and did not know of the falling platelet trend. But he testified that he would not have done anything differently even if he had known of the falling trend, because German would have died if he did not take immediate action. He testified:

> Q. On 9/20/02, if you had known that Mr. German's blood platelets were 68 on that day and were 243 upon admission, would you have called for a hematology consult?
>
> A. No.
>
> Q. And why is that?
>
> A. Because he was going to be dead in a short period of time if I didn't get him on bypass, and by the time we could have gotten a hematologist, he would be dead and his platelet count would have been immaterial.
>
> Q. So that would be the same for any blood platelet [**34] level?
>
> A. That's correct. It was my opinion, when the nurses asked me, that he was going to die in short order without getting on the heart lung machine, which is why I placed him on it. If he had been stable enough to wait, I would have done what it took to tide him over until his doctor, Dr. Ramchandani, was there.

Dr. Masud was also present at this same time, and he had been treating German for several days and was aware of the platelet count. Masud did not believe German had HIT at the time. Instead, he believed that the low platelet count was a direct result of German's multiple surgeries and his bleeding. He testified that if a nurse

had persisted in questioning his judgment as to the cause of German's bleeding, he would have thanked the nurse, explained why HIT was not the proper medical diagnosis, and, if necessary, asked for the nurse to be reassigned to another patient.

Three of German's other treating physicians also testified that they either had all the information necessary to diagnose HIT, or that, if a nurse suggested a diagnosis of HIT it would not have changed their course of action or their assessment that German did not have HIT. Dr. Lawrence Rice is a board-certified [**35] hematologist who was consulted regarding German's case. Rice testified that he would not have suspected HIT or ordered a heparin antibody test in the days following German's first surgery, even if he knew the complete history of platelet counts, because there were "a lot of alternative explanations for the things going on." He testified that the two additional surgeries and Reardon's action in placing German on an emergency heart-lung bypass machine were necessary to save German's life. And although German introduced evidence that an alternative blood thinner, Argatroban, was used in treating patients with HIT, Rice testified that even assuming German had HIT, he would not have recommended the use of an alternative blood thinner.

Dr. Luis Velez-Pestana, a physician who treated German in the cardiovascular ICU, testified that he had all the information he needed to care for German when he did. He said that although the nurses did not [*348] identify a downward "trend" in platelet levels, he made himself aware of German's platelet trend by checking his records. Velez testified that if a nurse had questioned him about whether German had HIT, he would have thanked her for the information "because [**36] it's very important what they see there with the patient all the time," but he would not have diagnosed HIT because German did not display the signs and symptoms of HIT at that time. Velez also testified that if the nurse said she believed German to be having an allergic or adverse reaction to heparin, he would have explained the clinical and laboratory findings comported more with use of the cardiopulmonary bypass pump and his extreme post-surgical bleeding than with a diagnosis of HIT.

Dr. Saleem Zaidi was another critical care specialist with Methodist who treated German. When asked if he would have acted differently if a nurse had suggested a diagnosis of HIT, Zaidi explained that HIT was already in his mind as a potential medical diagnosis, but the treatment for HIT would have exacerbated bleeding and German was already in a "life and death" situation. Moreover, Zaidi testified that he knew of the downward platelet trend because German was his patient, he had cared for him "continuously for four or five days," and

he had been checking German's laboratory results "continuously . . . interoperatively and post-operatively."

Chendrasekhar testified that if the nurses had informed Reardon [**37] of the downward trend in platelet levels, then Reardon should have called for a hematology consult and used the alternate anticoagulant when putting German on the heart-lung bypass machine. But Reardon specifically testified that he would not have taken that course of action if the nurses had informed him of German's platelet trend because it would have cost German his life--thus indicating that the nurses' failure to report in accordance with Chendrasekhar's opinion of how they should have did not cause German to receive heparin. Chendrasekhar actually agreed that the surgical and medical interventions performed at Methodist were necessary to save German's life and that he would have died if the doctors had not performed the second heart surgery. Finally, Chendrasekhar conceded that German's many symptoms and complications were consistent with diagnoses other than HIT, such as acute mitral valve regurgitation.

Causation requires proof that the "allegedly negligent act or omission constitute[s] 'a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.'" *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 246 (Tex. 2008)* (quoting [**38] *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason, 143 S.W.3d 794, 799 (Tex. 2004))*. "Proximate cause cannot be satisfied by mere conjecture, guess, or speculation." *Id.* German's treating physicians testified that additional information or questions from the nurses would not have changed their course of treatment, refuting the suggestion that any deficiency in the nurses' reporting proximately caused German's injuries. German properly notes that the jury could have disbelieved the treating doctors' testimony, but he still carried the burden of proving by a reasonable medical probability that his injuries were caused by the alleged breach of failing to identify trends in the information they had observed or by the alleged breach of failing to verbally notify a doctor about this information. Chendrasekhar offered opinion testimony that, with more information, a doctor should have requested a hematology consult and then should have altered the course of treatment so as to avoid use of heparin. But this speculative [*349] testimony is insufficient to raise a question of fact on the element of causation, particularly in light of the undisputed evidence that German would have died unless [**39] Reardon had immediately intervened. *See Hogue, 271 S.W.3d at 247.*

In sum, there is no evidence establishing a reasonable medical probability that the course of German's treatment was influenced by any failure by nurses to communicate information to physicians. *See Jelinek, 328*

*S.W.3d at 533.* The documentary record reflects that the doctors had all of the information they needed available to them, and the only fact question suggesting a breach of duty is whether the nurses should have done more to distill certain information for them. Regardless of any such breach by the nurses, the undisputed evidentiary record also reflects German would have died if the treating doctors altered their course of treatment to obtain the hematology consult suggested by German's expert. Accordingly, there is no proof that the nurses' alleged deficiencies were a substantial factor in bringing about German's injuries. *See Hogue, 271 S.W.3d at 246.* Chendrasekhar's opinions to the contrary were based on nothing more than conjecture, guess, or speculation, rendering them insufficient to establish proximate causation by a reasonable medical probability to support German's negligence claims.

## II. Failure to train [**40] nurses

German also claimed that Methodist was negligent for failing to train its nurses about potential adverse reactions to heparin. On appeal, Methodist contends that there is no evidence of the standard of care with regard to the hospital's duty to train because the trial court specifically ruled before trial that Dr. Chendrasekhar could not testify that Methodist should have provided nursing education concerning HIT or that Methodist maliciously failed to train its nurses about HIT. To prevail on this theory, German had to prove: (1) under the applicable standard of care, the hospital had a duty to train its nurses about HIT; (2) the hospital breached this duty; (3) he was injured; and (4) there is a causal connection between the breach of care and the injury. *See, e.g., Robins, 321 S.W.3d at 205.*

There is no evidence of the standard of care in the record. Nurse Knaack testified that, during the time when German was in the hospital, it was her job to make sure she had "hired and trained competent staff." She said that Methodist's nurses were trained to monitor the patients, including performing the head-to-toe assessment, looking at lab values, recording information, and reporting [**41] to the physicians. She testified that she did not specifically train the nurses that blood clotting could be an adverse reaction to heparin, and she could not say if that training had been otherwise provided to them. When asked whether the nurses were trained that a drop in platelet count was an adverse reaction to heparin, Knaack stated, "They are trained that a drop in platelet count can be an adverse reaction to many things, and it's the physician's decision whether it's related to heparin or whether it's a disease process."

Chendrasekhar did not testify as to a particular standard of care regarding training. He did not offer any opinion about what the nurses should have been taught, how they should have been trained, or how often they should received such instruction. He did not opine that the appropriate standard of care required Methodist to train its ICU nurses to recognize the adverse signs and symptoms of heparin. Rather, Chendrasekhar said that the excerpts from nursing journals were relevant to the appropriate standard of care. [*350] In addition, he testified that he was completely unaware of licensing or continuing education requirements for nurses. Thus, to the extent he did [**42] offer testimony pertinent to the standard of care for training, his testimony was not supported by a reliable foundation.

Even if there were evidence of the hospital's duty to train and a breach of that duty, German could not show that he was harmed by the hospital's failure to train unless it resulted in both the nurses' failure to conform to the proper standard of care and his injury. As we have explained, German's treating physicians testified that additional information or questions from the nurses would not have changed their course of treatment. Accordingly, there is no evidence of a causal connection between any alleged failure to train the nurses and the injuries that German alleges. *See Hogue, 271 S.W.3d at 247.* We therefore hold that there was no evidence of standard of care or causation for German's theory of negligent failure to train.

## Conclusion

Because we hold that there is no evidence of at least one element of each of German's theories of negligence, we sustain Methodist's first three issues. We reverse the trial court's judgment and render a take-nothing judgment in favor of Methodist. In light of this disposition, we need not address Methodist's remaining issues.

Michael [**43] Massengale

Justice